46 Cal.App.2d 859 (1941)
THE PEOPLE, Respondent,
v.
JOE ALBA et al. Appellants.
Crim No. 1775. 
California Court of Appeals. Third Dist. 
Sept. 26, 1941.
 Percy Napton for Appellants.
 Earl Warren, Attorney General, J. Q. Brown, Deputy Attorney General, and Thos. J. McBride for Respondent.
 THOMPSON, J.
 The defendants were convicted of the crime of grand theft accomplished by means of fraud as provided by section 484 of the Penal Code. Charles Martini was also charged with a prior conviction of another felony and pleaded guilty thereto. From the judgment which was accordingly rendered this appeal was perfected.
 It is contended the verdicts and judgment are not supported by the evidence for the chief reason that there is a lack of proof that the "three hundred dollars in money," which was fraudulently procured, was of that actual value. It is further asserted the defendants are not guilty of grand theft because the amount of the stolen money was subsequently recovered by the prosecuting witness by sale of an attached automobile in a civil action to satisfy a judgment for that sum, and for the further reason that he did not part with his money, relying on the defendants' alleged fraudulent representations, but, on the contrary, that he acted on his own judgment regarding the genuineness of the metal which was pledged to him as security for the loan. It is also claimed the court erred in giving and in refusing to give to the jury certain instructions, and that the district attorney was guilty of prejudicial misconduct in referring to the defendants as "rats" in his argument to the jury. *862
 [1] The fraud by means of which the defendants obtained three hundred dollars from the prosecuting witness consisted of entrusting to him a canvas bag containing particles of brass which they falsely represented to be free gold to be held by him as a pledge to secure the repayment of a loan of that sum. George Palamidesi is an Italian by birth. He operated a lunch counter and bar called the "Hideaway Cafee," adjoining the highway near Sacramento.
 Several days prior to the alleged theft two of the defendants, Alba and Martini, called at his place of business, representing themselves to be fellow countrymen. They said they came from Los Angeles and that they were seeking a location for a saloon and that they were also engaged in buying and selling gold. They often visited the Hideaway Cafe during that period of time, and, by their conduct and false statements ingratiated themselves in the confidence of Palamidesi. He had absolute faith in their honesty. February 28, 1941, they told their victim that they were about to purchase from a friend a quantity of free gold. In his presence they then called on the telephone the other defendant, Charles Busata, whom Palamidesi had not previously met, and requested him to bring the gold to the Hideaway Cafe. Within a few moments he appeared, carrying a brief case in his hand. He was introduced to the proprietor, and they spent some time together in friendly conversation and in drinking at the bar. Joe Alba, who went by the assumed name of John Barney, then asked Mr. Palamidesi if they could use his dining room to negotiate the purchase of the gold. He acquiesced and they all repaired to the dining room, where Busata took a small canvas bag from his portfolio and poured onto a piece of paper placed on the table some particles of yellow metal which looked like gold. He said that it was gold. Alba asked him if it was the same quality of gold they had previously purchased from him. He replied that it was. Alba asked him how much gold he had in the sack. He said that the sack contained twenty-four hundred dollars worth of gold. Alba told him he had "brought too much gold"; that he had only seventeen hundred dollars with which to purchase gold. After considerable conversation, intended to deceive Palamidesi into believing that it was a valid transaction to purchase genuine gold, Alba asked the proprietor if he could loan them seven hundred *863 dollars for a few hours to complete the bargain. Alba said they would leave the gold with him as security until they raised the balance of the purchase price, which they could do in a couple of hours, and that they would then repay him and redeem the gold. Mr. Palamidesi, relying upon their representations, said that he did not have so much money at hand, but offered to loan them three hundred dollars, which he promptly procured from his safe and handed to Alba. It does not appear whether the money consisted of coin or currency. Alba handed it to Busata, together with a purported roll of bills which he represented to be the seventeen hundred dollars they previously possessed. The wife of the proprietor testified she saw a twenty-dollar bill wrapped around the outside of that roll. Evidently that roll did not contain genuine currency, with the exception of the twenty-dollar bill with which it was enclosed, for after the subsequent arrest of the defendants they were found in possession of a large quantity of false currency called "stage money." The three hundred dollars was accepted and acknowledged by the defendants to be of the value of that sum of money, for they represented that the sack contained twenty-four hundred dollars' worth of gold and Busata credited three hundred dollars in addition to the seventeen hundred dollar roll of bills as payment of two thousand dollars toward the purchase price, for the defendants then said they would have to raise four hundred dollars more to consummate the purchase. The defendants then delivered the canvas sack with its contents to Mr. Palamidesi, saying they would go to Sacramento and raise seven hundred dollars, the balance of the purchase money, and return within two hours and repay him his three hundred dollars and redeem the sack of gold. The proprietor placed the sack in his safe and patiently waited for their return. Naturally, the defendants failed to come back. After two days Mr. Palamidesi took the sack of metal to a metallurgist to be assayed. It was then discovered that it contained no gold. It proved to consist of mere particles of brass. The defendants were subsequently apprehended and upon that evidence they were convicted of grand theft.
 There is ample evidence that the defendants were guilty of grand theft under section 484 of the Penal Code for stealing from George Palamidesi the sum of three hundred dollars in money, of that full value, by means of artifice, trickery *864 and fraud. They were charged with the theft of "three hundred dollars, lawful money of the United States." The record is replete with evidence that they procured "three hundred dollars in money," by means of fraud. Palamidesi took that sum "of money" from his safe and handed it to them as a temporary loan in part payment of a quantity of metal represented to consist of twenty-four hundred dollars' worth of gold. The loan was accepted as that full value for they agreed that only four hundred dollars of the purchase price remained unpaid. That furnishes sufficient evidence that the loan consisted of money of the value of three hundred dollars which fulfills the requirement of section 487 of the Penal Code.
 [2] Moreover, it was not necessary to specifically prove that the loan of three hundred dollars "in money" was actually worth that sum. Nor was it necessary to prove that it was paid in coin or currency, or what the denomination of the separate pieces of money were. The appellants suggest that, in the absence of evidence to the contrary, the reference to "three hundred dollars in money" might reasonably refer to Italian lira, German marks or Mexican dollars. We think not. It is clear the witnesses referred to the "three hundred dollars" and to "the money" which was procured by false pretenses, as circulating medium of the United States. The use of the word "money," under the circumstances of this case, implies that it is a circulating medium of this country with a fixed measure of value. (People v. Hatch, 163 Cal. 368, 375 [125 P. 907].) In 4 Restatement of the law of Torts, p. 572, sec. 911, it is said with relation to the value of money, "The value of money is assumed to be constant in actions for money tortiously taken." In the following paragraph of the same section it is further said, "Money as used herein means only domestic currency." In the case of People v. Lammerts, 164 N.Y. 137 [58 N.E. 22, 23], it is said with reference to the meaning of the term "money" that "'Dollars' and 'cents' have a well-recognized meaning as commonly used. The common definition is, the unit of money by which values ... are measured." In holding that an information stated a good cause of action for money obtained by false pretenses, which merely alleged that the defendant procured "the sum of twenty ($20) dollars" in that manner, without stating any value thereof, *865 it is said in State v. Ryan, 34 Wash. 597 [76 P. 90], that:
 "But appellant claims that it should have alleged that the $20 was money and of some value. We think it would be difficult to define the meaning of the words 'twenty dollars' if they do not mean that sum of money. Everybody in this country knows that the word 'dollar' means a certain amount of money. ..."
 It has been uniformly held that the use of the word "dollar," when applied to United States circulating medium, means a fixed and definite value of one hundred cents. (McDonald v. State, 2 Ga. App. 633 [58 S.E. 1067, 1068]; Maxwell v. State, 9 Ga. App. 875 [72 S.E. 445]; People v. Dillon, 1 Cal.App.2d 224, 228 [36 PaCal.2d 416]; People v. Hill, 2 Cal.App.2d 141, 148 [37 PaCal.2d 849]; 13 Words and Phrases, Perm. Ed., p. 240.) In the case of Newlove v. Mercantile Trust Co. of S. F., 156 Cal. 657 [105 P. 971] at page 664, the court says:
 "The dollar is the legal unit of money in the United States, and whenever figures are used to denote a sum of money 'such figures must, of course, be understood to represent "dollars" unless a different intention is clearly expressed.'"
 We conclude that the proof in the present case that the defendants procured by means of fraud from George Palamidesi the sum of "three hundred dollars in money," establishes the fact that the money was circulating medium of the United States of that specified value, and that the offense therefore amounted to grand theft.
 [3] Grand theft is accomplished by fraudulently procuring a sum of money in excess of two hundred dollars from the owner by means of artifice, trickery or misrepresentations even though it is obtained as a pretended loan if it appears to be the intention of the accused person at the time of the transaction not to repay the money. (People v. Weibert, 18 Cal.App.2d 457, 464 [64 PaCal.2d 169]; In re Clark, 34 Cal.App. 440 [167 P. 1143]; 15 Cal.Jur. 905, secs. 11 and 12; 32 Am. Jur. 922, sec. 32.) The question of the intent with which the money is procured is a matter for the determination of the jury. (People v. Edwards, 72 Cal.App. 102, 117 [236 P. 944].) In the present case there is no doubt the defendants had the intention to permanently deprive the owner of his money, and to never repay it, at the *866 time when they fraudulently procured it by false representations as a pretended temporary loan.
 [4] The fact that George Palamidesi subsequently recovered judgment against the defendants in a civil action, and satisfied the judgment by an execution sale of their automobile, does not relieve them from prosecution and conviction of grand theft for feloniously procuring a pretended loan of the money by means of false representations. Not even a voluntary repayment of the money after the crime was committed would relieve them from criminal liability. (36 C.J. 915, sec. 504; 32 Am. Jur. 1029, sec. 117.)
 [5a] The appellants contend that the judgment should be reversed for failure to affirmatively prove that Palamidesi relied on the alleged false representations in loaning his money to them. The false representations which induced the proprietor of the Hideaway Cafe to part with his money consist of Alba's promise that if he would loan defendants three hundred dollars "for a couple of hours," they would raise the balance of the purchase price of the gold and repay him and redeem their sack of gold, and also that the sack contained genuine gold and not mere particles of brass. Clearly the defendants then intended to thereby permanently defraud him of his money. He could not have possibly known they did not intend to repay him. He repeatedly testified positively that he relied upon them and their false statements that the sack contained twenty-four hundred dollars' worth of genuine gold. He had no special knowledge of the character of the metal in the sack. He did not even examine it. He merely saw them at a distance pour some of the particles on a sheet of paper and heard them discussing it as genuine gold. They repeatedly called it gold. Regarding his reliance upon their false statements he testified:
 "Joe Alba told me ... we will go down town and in a couple of hours we will bring you the money and we will leave the gold for security. ... Q. Did you believe that that was gold in the canvas bag? A. Sure I believed it. ... He told me it was gold. ... Q. Then you loaned him the three hundred dollars because you thought it was gold, didn't you? A. Yes. ... Q. You decided it was gold, didn't you? A. That is what they told me. Q. You decided what they told you was all right? A. I believed them, sure. ... Q. You did not try to find out whether it was gold or not? *867 A. No. I just figured on trusting them. ... Q. And you relied on his statement that it was gold? A. Yes."
 [6] It is true that the crime of theft, accomplished by means of false representations, under section 484 of the Penal Code, may not be consummated when the owner of the money or property knows the statements are false, or even when he parts with his money or property without relying on the false representations. The very gist of that offense is that the property is procured by means of the false representations except for which the owner would not part with his possession of it. (12 Cal.Jur. 750, sec. 29.) However, in civil suits, in the absence of evidence to the contrary, proof of false representations which are calculated to deceive one and which are made with the intent to defraud one of his property, raises the presumption they did actually induce him to do so. Under such circumstances it is necessary for the defendant to prove as an affirmative defense that the injured party did not rely on the false representations. (Pohl v. Mills, 218 Cal. 641, 652 [24 PaCal.2d 476]; Troy Laundry Machinery Co., Ltd., v. Drivers' Independent Laundry Co., 14 Cal.App. 152, 155 [111 P. 121].) In the Pohl case, supra, quoting with approval from the case of De Garmo v. Petitfils Confiserie, 93 Cal.App. 261, 270 [269 P. 692], it is said in that regard:
 "... the representations made to appellant were ones calculated to induce him to buy the stock and he did, in fact, make the purchase; therefore, the presumption is that the representations induced him to do so, and in order to take away his right to relief on the ground of fraud, it must be shown that he did not rely upon said representations."
 [5b] In the present criminal case, notwithstanding the fact that false representations were made which were calculated to induce the owner to part with his property, it is not necessary to determine that the burden shifted to the defendants to show that he did not rely on those fraudulent representations. There is an abundance of evidence to prove affirmatively that he did rely on those false representations in entrusting his three hundred dollars to the defendants.
 [7] We find no error in the challenged instructions which were given to the jury or refused. The refused instructions were fully covered by others which were given to the jury in the charge of the court. All of the necessary elements constituting *868 theft accomplished by means of fraudulent representations were fully stated in the court's charge to the jury. We are of the opinion the jury was very fully and fairly instructed regarding the necessary elements of the crime with which the defendants were charged. The jurors were told that the misrepresentations which were made must have been known to the defendants to be false; that they were made with the intention of fraudulently inducing the owner to part with his money; that he relied upon the statements as true, and that he was thereby induced to and did part with his money on that account. At the request of the prosecution, the following instruction was properly given to the jury in that regard:
 "Theft by trick and device may be accomplished by obtaining the property both by words and acts on the part of the accused, which are known by him to be false and fraudulent and which are made by him with the intention of inducing the owner of the property to be deceived, and [when the owner] relying on such deception thereby consents to the transfer of the possession of his property to the accused."
 [8] We are of the opinion the reference of the district attorney to the defendants as "rats," in the course of his argument to the jury, does not constitute reversible error. We do not justify the use of such epithets in the argument of a prosecuting officer, directed toward an accused person in the course of his trial. It is evidence of indiscretion and an excess of zeal. No doubt the jurors recognized it as such. We assume that the language was used because the appellants' brief so states. But the argument of the district attorney does not appear in the transcript. However, the appellants concede that an objection to that language was sustained, and we assume the court properly instructed the jury to disregard it. It is stated by the appellants that the court reprimanded the prosecuting officer for using the language. Assuming that it constituted misconduct, it is not reversible error for the reason that there was not a miscarriage of justice in the conviction of the defendants. The crime of which they were convicted is most reprehensible, and there appears to be no doubt of their guilt. None of the defendants took the witness stand in his own behalf.
 The judgment and order are affirmed.
 Tuttle, J., and Pullen P. J., concurred.