[Crim. No. 8914.   In Bank.   May 23, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. MARVIN PHILLIPS, Defendant and Appellant.

Melvin M. Belli, Samuel S. Brody, Belli, Ashe, Gerry & Leon, Belli, Ashe & Gerry, Brody, Grayson & Green, Daniel J. Jaffe, Lou Ashe, Richard Gerry, Seymour Ellison, Frederick Cone and N. Rommel Bondoc for Defendant and Appellant.

Burton Marks as Amicus Curiae on behalf of Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, William L. Zessar, Deputy Attorney General, William B. McKesson and Evelle J. Younger, District Attorneys, and John W. Miner, Deputy District Attorney, for Plaintiff and Respondent.

TOBRINER, J.—Defendant, a doctor of chiropractic, appeals from a judgment of the Superior Court of Los Angeles

County convicting him of second degree murder in connection with the death from cancer of one of his patients. We reverse solely on the ground that the trial court erred in giving a felony-murder instruction.

Linda Epping died on December 29, 1961, at the age of 8, from a rare and fast-growing form of eye cancer. Linda's mother first observed a swelling over the girl's left eye in June of that year. The doctor whom she consulted recommended that Linda be taken to Dr. Straatsma, an opthalmologist at the UCLA Medical Center. On July 10th Dr. Straatsma first saw Linda; on July 17th the girl, suffering great pain, was admitted to the center. Dr. Straatsma performed an exploratory operation and the resulting biopsy established the nature of the child's affliction.

Dr. Straatsma advised Linda's parents that her only hope for survival lay in immediate surgical removal of the affected eye. The Eppings were loath to permit such surgery, but on the morning of July 21st Mr. Epping called the hospital and gave his oral consent. The Eppings arrived at the hospital that afternoon to consult with the surgeon. While waiting they encountered a Mrs. Eaton who told them that defendant had cured her son of a brain tumor without surgery.

Mrs. Epping called defendant at his office. According to the Eppings, defendant repeatedly assured them that he could cure Linda without surgery. They testified that defendant urged them to take Linda out of the hospital, claiming that the hospital was "an experimental place," that the doctors there would use Linda as "a human guinea pig" and would relieve the Eppings of their money as well.

The Eppings testified that in reliance upon defendant's statements they took Linda out of the hospital and placed her under defendant's care. They stated that if defendant had not represented to them that he could cure the child without surgery and that the UCLA doctors were only interested in experimentation, they would have proceeded with the scheduled operation. The prosecution introduced medical testimony which tended to prove that if Linda had undergone surgery on July 21st her life would have been prolonged or she would have been completely cured.

Defendant treated Linda from July 22 to August 12, 1961. He charged an advance fee of $500 for three months' care as well as a sum exceeding $200 for pills and medicines. On August 13th Linda's condition had not improved; the Eppings dismissed defendant.

Later the Eppings sought to cure Linda by means of a Mexican herbal drug known as yerba mansa and, about the 1st of September, they placed her under the care of the Christian Science movement. They did not take her back to the hospital for treatment.

Defendant testified that he knew that he could not cure cancer, that he did not represent to the Eppings that he could do so, that he urged them to return Linda to the hospital and that he agreed to treat her only when it became clear that the Eppings would never consent to surgery. He further testified that in administering treatment he sought to build up Linda's general health and so prolong her life. He insisted that he had never purported to "treat" cancer as such, but only to give "supportive" care to the body as a whole. He variously described his purpose as being "to build up her resistance," "assisting the body to overcome its own deficiencies" and "supporting the body defenses."

As we have noted, the trial court gave an instruction on felony murder; we point out that, although defendant could, of course, be prosecuted for grand theft, such a crime, not an inherently dangerous felony, does not support an instruction on felony murder. The giving of that instruction caused defendant prejudice and compels reversal. Initially, however, we dispose of defendant's argument that the prosecution failed to establish such causal relationship between defendant's conduct and the death as is requisite to his criminal responsibility.

### Legal Cause

We cannot accept defendant's contention that his conduct did not proximately cause Linda's death. Defendant's argument rests upon either of two unsupportable propositions: (1) that the testimony failed as a matter of law to establish a causal relationship between the absence of surgery on July 21st and any shortening of Linda's life; (2) that the conduct of Linda's parents subsequent to defendant's dismissal constituted an "independent intervening force" between the misrepresentation and Linda's death.

The fact that defendant represented that he could cure Linda without surgery and that such representation caused the Eppings to remove Linda from the hospital finds ample substantiation in the record. The medical evidence likewise supports the jury's conclusion that the cancellation of the operation had the effect of shortening the child's life.[1]

---

[1] We find no merit whatsoever in defendant's contention that the prosecution's expert witnesses were not qualified to testify as to their opinions

█ Dr. Straatsma testified with "reasonable medical certainty"[2] that the performance of the operation on July 21st would have extended Linda's life by a minimum of two months. █ He also gave his opinion that surgery on that date could have effected a complete cure.

Although defendant maintains that Dr. Straatsma on cross-examination disclaimed his testimony as to the beneficial effect of the operation planned for July 21st, the record does not support that contention. Dr. Straatsma merely acknowledged that he could not say with certainty whether the course of the disease had become irreversible on July 21st. The doctor also testified that he could not state the exact period of time by which surgery on that date would have lengthened Linda's life. Neither aspect of the doctor's cross-examination in any way reduced the force of his earlier testimony that if the girl had received the scheduled operation, her life would have been extended by a substantial period.

The showing that the length of Linda's life had thus been limited sufficed for this aspect of the prosecution's case; no burden rested upon the prosecution to prove that the operation would have cured the disease. █ Murder is never more than the shortening of life; if a defendant's culpable act has significantly decreased the span of a human life, the law will not hear him say that his victim would thereafter have died in any event. (*People* v. *Moan* (1884) 65 Cal. 532, 537 [4 P. 545]; *People* v. *Ah Fat* (1874) 48 Cal. 61, 64; Perkins, Criminal Law, pp. 27-28.) █ The jury could properly have found that defendant's conduct proximately caused Linda's death.

---

that surgery on the 21st of July would have prolonged Linda's life. A wide discretion, of course, reposes in the trial court to determine the sufficiency of the qualifications of expert witnesses. An appellate court will not disturb its ruling on that matter in the absence of a manifest abuse of such discretion. (*People* v. *Busch* (1961) 56 Cal.2d 868, 878 [16 Cal.Rptr. 898, 366 P.2d 314].) The record fully demonstrated the qualifications of the doctors; the court properly permitted the introduction of such expert testimony.

[2] We do not accept defendant's contention that the doctor's testimony failed as a matter of law to sustain the conviction because this testimony was couched in terms of "reasonable medical certainty" rather than of "beyond a reasonable doubt." We do not believe that the questions answered as to the effect of the surgery should have been framed in the terminology of "beyond a reasonable doubt," which expresses the ultimate issue for the determination of the jury. To hold that medical opinion fails as a matter of law to sustain a jury in reaching a conviction "beyond a reasonable doubt," because the testimony rests upon "reasonable medical certainty," would in substance foreclose the realistic use of medical testimony at criminal trials.

█ As we have stated, defendant secondly contends that the actions of Linda's parents subsequent to his dismissal operated as an "independent intervening force" to relieve him of criminal responsibility for her death. He urges that no act of his caused the Eppings to abstain from surgery beyond August 13th, the date of his discharge.[3]

In pressing this argument, defendant assumes that if the surgery had been performed after Linda left his care, it would have been as efficacious in arresting or retarding the cancer as surgery performed on July 21st. The record refutes this assumption. The evidence established that the tumor grew dramatically during the period in which Linda submitted to defendant's ministrations; Dr. Straatsma testified that her prospects dimmed rapidly with the passage of time. The jury could properly have concluded that defendant's conduct in preventing the operation during his treatment measurably reduced the period by which surgery would have extended Linda's life and significantly diminished her chances for a complete recovery.

### The Instruction on Second Degree Felony-Murder.

Defendant challenges the propriety of the trial court's instructions to the jury. █ The court gave the following tripartite instruction on murder in the second degree:[4]

"[T]he unlawful killing of a human being with malice aforethought, but without a deliberately formed and premeditated intent to kill, is murder of the second degree:

"(1) If the killing proximately results from an unlawful act, the natural consequences of which are dangerous to life, which act is deliberately performed by a person who knows that his conduct endangers the life of another, or

"(2) If the circumstances proximately causing the killing show an abandoned and malignant heart, or

"(3) If the killing is done in the perpetration or attempt to perpetrate a felony such as Grand Theft. If a death occurs in

---

[3] One possible answer to this contention lies in the fact that defendant, at the time of his initial conversations with the Eppings, was aware of their belief that once they removed Linda from the hospital, they could not thereafter take her back. The prosecution could persuasively contend that defendant's responsibility for preventing surgery thereby extended beyond the date of his dismissal.

[4] The record suggests that the evidence would have supported a finding of involuntary manslaughter. The jury might, for example, have found that defendant sincerely, though *unreasonably,* believed that the removal of Linda from the hospital and treatment according to the principles of chiropractic would be in her best interests. Having so found, the jury

the perpetration of a course of conduct amounting to Grand Theft, which course of conduct is a proximate cause of the unlawful killing of a human being, such course of conduct constitutes murder in the second degree, even though the death was not intended.''

The third part of this instruction rests upon the felony-murder rule and reflects the prosecution's theory that defendant's conduct amounted to grand theft by false pretenses in violation of Penal Code section 484.

We shall point out why we have concluded that (1) defendant's contention that section 1714 of the Health and Safety Code preempts the field of fraudulent representation of a cancer cure and therefore precludes an instruction on felony murder, cannot stand; (2) the felony-murder instruction given here was erroneous in that such a charge can properly be grounded *only* upon a felony ''inherently dangerous to life,'' and grand theft is not such a crime; (3) the erroneous instruction caused defendant prejudice because it removed from the jury the issue of malice, and (4) the prosecution cannot successfully argue that even though the instruction erroneously permitted the jury to convict without finding malice, no prejudice resulted because the jury necessarily found facts which established malice as a matter of law.

As we have noted, defendant first challenges the felony-murder instruction on the ground that the field of fraudulent misrepresentations as to cures for cancer has been ''preempted'' by section 1714 of the Health and Safety Code. That section condemns as a *misdemeanor* ''falsely to represent a device, substance or treatment as effective to arrest or cure cancer.'' Defendant urges that section 1714 precludes a determination that he was guilty of the *felony* of grand theft pur-

---

could have concluded that in causing Linda's removal from the hospital and so endangering her life defendant acted ''without due caution and circumspection.'' (Pen. Code, § 192, subd. 2.) Accordingly, the trial court should have given a manslaughter instruction. (*People* v. *Modesto* (1963) 59 Cal.2d 722, 729-730 [31 Cal.Rptr. 225, 382 P.2d 33]; *People* v. *Henderson* (1963) 60 Cal.2d 482, 489-491 [35 Cal.Rptr. 77, 386 P.2d 677].) The record reveals, however, that defendant's counsel strongly opposed the manslaughter instruction and indicated to the trial court that he considered it ''tactically'' to defendant's advantage to confront the jury with the limited choice between murder and acquittal. Thus the failure of the trial court to instruct on manslaughter, though erroneous, was invited error; defendant may not properly complain of such error on appeal. (*People* v. *Wright* (1914) 167 Cal. 1, 7 [138 P. 349]; *People* v. *Hite* (1901) 135 Cal. 76, 79-80 [67 P.2d 57]; *People* v. *Jones* (1965) 232 Cal.App.2d 379, 390 [42 Cal.Rptr. 714]; *People* v. *Johnson* (1962) 203 Cal.App.2d 624, 629-630 [21 Cal.Rptr. 650].)

suant to Penal Code section 484; hence section 1714 necessarily prevents the application of the felony-murder rule.

We cannot accept the proposition that the misdemeanor section forecloses the felony prosecution. A conviction for grand theft requires proof that the victim relied on defendant's representations and that he actually parted with value. (*People* v. *Gibbs* (1893) 98 Cal. 661, 663 [33 P. 630]; *People* v. *Alba* (1941) 46 Cal.App.2d 859, 867 [117 P.2d 63]; see 1 Witkin, Cal. Crimes, §§ 410, 416.) No such requirements need be met in prosecutions under Health and Safety Code section 1714. Accordingly, we may infer that the Legislature intended the new statute to supplement, not supplant, Penal Code section 484. In the circumstance in which some elements of grand theft are lacking the Legislature thereby provided a means for the prosecution of those who fraudulently assert that they can cure cancer. We consequently reject the hypothesis that the Legislature, by undertaking to facilitate the punishment of those who fraudulently offer cures for cancer, thereby immunized from prosecution under Penal Code section 484 conduct which theretofore would have been punishable under that section.

■ Despite defendant's contention that the Penal Code does not expressly set forth any provision for second degree felony murder and that, therefore, we should not follow any such doctrine here, the concept lies imbedded in our law. We have stated in *People* v. *Williams* (1965) 63 Cal.2d 452 [47 Cal.Rptr. 7, 406 P.2d 647], that the cases hold that the perpetration of some felonies, exclusive of those enumerated in Penal Code section 189, may provide the basis for a murder conviction under the felony-murder rule. (See also *People* v. *Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892].)

We have held, however, that only such felonies as are in themselves "inherently dangerous to human life" can support the application of the felony-murder rule. We have ruled that in assessing such peril to human life inherent in any given felony "we look to the elements of the felony in the abstract, not the particular 'facts' of the case." (*People* v. *Williams*, *supra*, 63 Cal.2d 452, 458, fn. 5.)

We have thus recognized that the felony-murder doctrine expresses a highly artificial concept that deserves no extension beyond its required application.[5] Indeed, the rule itself has

---

[5]As we stated in *People* v. *Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130], "The felony-murder rule has been criticized on the grounds that in almost all cases in which it is applied it is unnecessary and that it erodes the relation between criminal liability and

been abandoned by the courts of England, where it had its inception.[6] It has been subjected to severe and sweeping criticism.[7] No case to our knowledge in any jurisdiction has held that because death results from a course of conduct involving a felonious perpetration of a fraud, the felony-murder doctrine can be invoked.[8]

Admitting that grand theft is not inherently dangerous to life, the prosecution asks us to encompass the entire course of defendant's conduct so that we may incorporate such elements as would make his crime inherently dangerous. In so framing the definition of a given felony for the purpose of assessing its inherent peril to life the prosecution would abandon the statutory definition of the felony as such and substitute the factual elements of defendant's actual conduct. In the present case the Attorney General would characterize that conduct as "grand theft medical fraud," and this newly created "felony," he urges, clearly involves danger to human life and supports an application of the felony-murder rule.

To fragmentize the "course of conduct" of defendant so that the felony-murder rule applies if any segment of that conduct may be considered dangerous to life would widen the

---

moral culpability. (See e.g., Model Penal Code (Tent. Draft No. 9, May 8, 1959) § 201.2, comment 4 at pp. 37-39; Report of the Royal Commission on Capital Punishment, Cmd. No. 8932, at pp. 34-43, 45 (1949-1953); 3 Stephen, History of the Criminal Law of England 57-58, 74-75 (1883); Packer, *The Case for Revision of the Penal Code*, 13 Stan.L.Rev. 252, 259; Morris, *The Felon's Responsibility for the Lethal Acts of Others*, 105 U.Pa.L.Rev. 50; 66 Yale L.J. 427.) Although it is the law in this state (Pen. Code, § 189), it should not be extended beyond any rational function that it is designed to serve . . . ." (Fn. omitted.)

[6]The felony-murder doctrine has been censured not only because it artificially imposes malice as to one crime because of defendant's commission of another but because it anachronistically resurrects from a bygone age a "barbaric" concept that has been discarded in the place of its origin. Thus Witkin says: "Some writers describe the concept as barbaric and urge its abolition or strict limitation. (See 1957 A.S. 99 [abolished by English Homicide Act of 1957]; 1958 A.S. 125; Clark and Marshall, p. 594; 71 Harv.L.Rev. 1565; 13 Stan.L.Rev. 259; Moreland, pp. 49, 224.)" (1 Witkin, Cal. Crimes (1963) § 311, p. 284.)

[7]"The felony-murder rule, composed as it is of several presumptions, is a legal Hydra.*

[8]Respondent's brief points out that this is "the first case of murder by false pretenses to reach an appellate court in the seven hundred years of recorded Anglo-American Law." (P. 27.) For a discussion of this aspect of the instant case, see *Recent Decisions* (1965) 32 Brooklyn L.Rev. 192, 194-195.

*"Like the multiheaded beast of Greek mythology, the felony murder rule has several 'heads' of its own, each willing to consume one of the accused's defenses by presuming a needed element in the proof of felony murder." *Recent Developments, California Rewrites Felony Murder Rule* (1966) 18 Stan.L.Rev. 690.

rule beyond calculation. It would then apply not only to the commission of specific felonies, which are themselves dangerous to life, but to the perpetration of *any* felony during which defendant may have acted in such a manner as to endanger life.

The proposed approach would entail the rejection of our holding in *Williams*. That case limited the felony-murder doctrine to such felonies as were themselves inherently dangerous to life. That decision eschews the prosecution's present sweeping concept because, once the Legislature's own definition is discarded, the number or nature of the contextual elements which could be incorporated into an expanded felony terminology would be limitless. We have been, and remain, unwilling to embark on such an uncharted sea of felony murder.

■ The felony-murder instruction should not, then, have been given; its rendition, further, worked prejudice upon defendant. It withdrew from the jury the issue of malice, permitting a conviction upon the bare showing that Linda's death proximately resulted from conduct of defendant amounting to grand theft. The instruction as rendered did not require the jury to find either express malice or the implied malice which is manifested in an "intent with conscious disregard for life to commit acts likely to kill." (*People* v. *Washington, supra,* 62 Cal.2d 777, 780; *People* v. *Conley* (1966) *ante,* p. 310 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Thomas* (1953) 41 Cal.2d 470, 479 [261 P.2d 1] [concurring opinion of Justice Traynor].)[9]

The instruction thus relieved the jury of the necessity of finding one of the elements of the crime of murder. (Pen. Code, § 187; *People* v. *Washington, supra,* 62 Cal.2d 777, 780; *People* v. *Wells* (1949) 33 Cal.2d 330, 346 [202 P.2d 53].) Even if the evidence could have supported a finding of implied malice, the instruction failed to require the jury so to determine. "[D]efendants have a constitutional right to have the jury determine every material issue presented by the evi-

---

[9] We are aware that the portion of the trial court's charge in which the felony-murder instruction appears is prefaced with the statement: "[T]he unlawful killing of a human being with malice aforethought, but without a deliberately formed and premeditated intent to kill, is murder in the second degree [when] . . . ." The three numbered sections which follow set forth ways in which malice can be proved, the last being the erroneous felony-murder instruction. We do not believe, and the Attorney General has not urged, that the court intended, or the jury understood, the above quoted general statement to require that the jury make a finding of malice independent of its determination that the requirements of one of the numbered sections had been met.

dence. . . ." (*People* v. *Gilbert* (1965) 63 Cal.2d 690, 704 [47 Cal.Rptr. 909, 408 P.2d 365]; *People* v. *Conley, supra, ante,* pp. 310, 319; *People* v. *Modesto, supra,* 59 Cal.2d 722, 730 and cases cited.) The denial of defendant's right to a determination by the jury as to whether he acted with malice resulted in a miscarriage of justice within the meaning of California Constitution, article VI, section 4½. (*People* v. *Conley, supra, ante,* at pp. 319-320; *People* v. *Gilbert, supra,* 63 Cal.2d at p. 704; *People* v. *Williams, supra,* 63 Cal.2d 452, 457-460.)

The prosecution does not deny that the giving of a felony-murder instruction engendered the possibility of a conviction of murder in the absence of a finding of malice. It contends, however, that even if the jury acted on the erroneous instruction it must necessarily have found facts which establish, as a matter of law, that defendant acted with conscious disregard for life and hence with malice. The prosecution thus asks us to dissect the jury's verdict, setting the facts of the case against the instructions in an attempt to isolate the facts which the jury necessarily found in reaching its verdict. From these facts it further asks us to infer the existence of others which the jury was never asked to find.

Examination of the record suggests that even this doubtful enterprise would not enable us to overcome the effect of the erroneous instruction. The prosecution urges that the jury could not have convicted defendant under the felony-murder instruction without having found that he made representations to the Eppings which he knew to be false or which he recklessly rendered without information which would justify a reasonable belief in their truth. Such a finding does not, however, establish as a matter of law the existence of an "intent with conscious disregard for life to commit acts likely to kill." (*People* v. *Washington, supra,* 62 Cal.2d 777, 780.) In the absence of a finding that defendant subjectively appreciated the peril to which his conduct exposed the girl, we cannot determine that he acted with conscious disregard for life. The record contains evidence from which a trier of fact could reasonably have concluded that although defendant made false representations concerning his ability to cure, he nevertheless believed that the treatment which he proposed to give would be as efficacious in relieving pain and prolonging life as the scheduled surgery.[10]

---

[10]For example, defendant testified that he believed the girl's cancer to be incurable and understood that surgery might stimulate the spread of the disease to other parts of the body and thus hasten death. To some extent this evidence was contradicted by defendant's further testimony

Of course the jury could have concluded from some of the evidence that defendant did *not* entertain any such belief in the relative efficacy of his proposed treatment. We cannot, however, undertake to resolve this evidentiary conflict without invading the province of the trier of fact. We cannot predicate a finding of conscious disregard of life upon a record that would as conclusively afford a basis for the opposite conclusion.

### The Remaining Instructions on Murder in the Second Degree

In the foregoing discussion we have analyzed the third subdivision of the tripartite instruction on murder in the second degree; here we propose to state our position on the first and second subdivisions. As we have previously noted, the court told the jury that the "unlawful killing of a human being with malice aforethought, but without a deliberately formed and premeditated intent to kill, is murder of the second degree (1) If the killing proximately results from an unlawful act, the natural consequences of which are dangerous to life, which act is deliberately performed by a person who knows that his conduct endangers the life of another, or (2) If the circumstances proximately causing the killing show an abandoned and malignant heart. . . ."

The first subdivision of the instruction embodies the language of decisions interpreting the cryptic statutory requirement of an "abandoned and malignant heart." (*People v. Conley, supra, ante,* pp. 310, 321; *People v. Washington, supra,* 62 Cal.2d 777, 780; *People v. Thomas, supra,* 41 Cal.2d 470, 479-480 [concurring opinion of Justice Traynor].) We believe the instruction entirely proper except for the requirement that the act of the defendant be "unlawful." If that word connotes an absence of legally sufficient justification or excuse, we see no objection to its presence. Indeed the jury should be cautioned that a defendant would not be guilty of second degree murder by reason of committing an act that

---

that he repeatedly urged the Epping's to return Linda to the hospital. The jury, however, was not bound to accept all of defendant's testimony, and substantial evidence supported a reasonable conclusion that defendant believed that he was not endangering Linda's life by persuading her parents to put her under his care.

Proof that defendant entertained such a belief would only establish a defense to murder. If the jury found that defendant acted "without due caution and circumspection" in forming and entertaining this belief he would be subject to conviction for involuntary manslaughter. (Pen. Code, § 192, subd. 2.)

may be dangerous but nevertheless may be necessary to the preservation of life.

On the other hand, the word "unlawful" may suggest to the jury that the prosecution must prove that in performing the acts upon which the murder prosecution rests defendant was also committing some other, quite independent, crime. Insofar as the instruction bears this latter meaning it states a requirement not found in the decided cases and which in our judgment the prosecution need not prove.

An instruction that may more successfully cover the issue of justification or excuse and at the same time not improperly call for proof of other independent criminal conduct could be phrased in terms of "an intent with conscious disregard for life to commit acts likely to kill." (See *People* v. *Washington, supra,* 62 Cal.2d 777, 780.) Such an instruction thus would make possible a conviction of second degree murder upon a finding that "although there was no deliberately formed and premeditated intent to kill, the killing proximately resulted from an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life."

With the above modification, the instruction fully and accurately imparts to the jury every element of implied malice as that concept has been developed in this state. Such an instruction renders unnecessary and undesirable an instruction in terms of "abandoned and malignant heart." The instruction phrased in the latter terms adds nothing to the jury's understanding of implied malice; its obscure metaphor invites confusion and unguided speculation.[11]

The charge in the terms of the "abandoned and malignant heart" could lead the jury to equate the malignant heart with an evil disposition or a despicable character; the jury, then, in a close case, may convict because it believes the defendant a "bad man."[12] We should not turn the focus of the jury's task from close analysis of the facts to loose evalu-

[11] "Hardness of the arteries is an ascertainable concept—but not of the heart; malignant cancer is similarly ascertainable, but not malignant hearts; also abandoned children but not abandoned hearts. As sophisticated as human knowledge has become regarding anatomy of the body, the anatomy of the crime concept—and especially of malice—has remained as mysterious for many courts as it was for cavemen. Why not stop abusing the poor heart?" (Mueller and Wall, *Criminal Law,* 1964 Annual Survey of American Law, pp. 33, 41.)

[12] (Comment, *Ambiguous Abandon and Murky Malignancy: Charging the Jury on Implied Malice* (1966) 114 U.Pa.L.Rev. 495, 496.)

ation of defendant's character. The presence of the metaphysical language in the statute does not compel its incorporation in instructions if to do so would create superfluity and possible confusion. In its origin the language did no more than phrase a companion or alternative description of a conscious disregard of life;[13] since the instruction here specifically sets forth the latter, the former merely duplicates it.

The instruction in terms of "abandoned and malignant heart" contains a further vice. It may encourage the jury to apply an objective rather than subjective standard in determining whether the defendant acted with conscious disregard of life, thereby entirely obliterating the line which separates murder from involuntary manslaughter.[14]

Although we do not hold that the inclusion of a reference in an instruction to an "abandoned and malignant heart" constitutes error we think that it is a superfluous charge. The dangers inherent in it and the absence of any compensating advantage impel us to suggest its replacement with the more comprehensive and informative charge in the first of the three subdivisions of the instructions in the form that we have submitted.

The judgment is reversed.

Traynor, C. J., Peters, J., and Peek, J., concurred.

BURKE, J.—I dissent. The majority opinion reverses the judgment of conviction of second degree murder "solely on the ground that the trial court erred in giving a felony-

---

[13] "When the common law was embodied in the criminal statutes of the various states, the legislatures which attempted specifically to describe this category of homicide (rather than to accept the common-law description through language such as 'and all other murders. . . .') used either the abandoned and malignant heart language or 'an act imminently dangerous to others, and evincing a depraved mind, regardless of human life' or a combination of the two. The latter phrase is the more prevalent and sets forth the standard in clearer language, embodying most of the qualities of Stephen's definition. Because of its common origin with the abandoned and malignant heart formulation, this phrase is a useful reference in attempting to clarify its ambiguity. Both the common law and this statutory description demonstrate that the requested charge must focus on the state of mind and emphasize the knowledge of danger and disregard for life." (Comment, *Ambiguous Abandon and Murky Malignancy: Charging the Jury on Implied Malice, supra,* 114 U.Pa.L.Rev. 495, 497.)

[14] See Collings, *Negligent Murder* (1961) 49 Cal.L.Rev. 254, 284, 288-291. We believe the distinction between the two crimes in the present case is particularly important because the jury could have concluded from some of the evidence that defendant genuinely, though unreasonably, believed that he was not endangering the life of the girl by causing her to be taken from the hospital and placed under his care.

murder instruction." Under section 4½, article VI, of the California Constitution "No judgment shall be set aside . . . on the ground of misdirection of the jury . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." I submit that here a miscarriage of justice did not result from any error in giving the instruction in view of the overwhelming evidence that defendant, motivated by mercenary greed, acted in conscious disregard for the life of 8-year-old Linda Epping when he induced her parents to cancel the scheduled cancer operation and place her under his care, thereby shortening her life.

The majority eschew the test in article VI, section 4½, of the Constitution by asserting that the instruction "caused defendant prejudice because it removed from the jury the issue of malice" and that "The denial of defendant's right to a determination by the jury as to whether he acted with malice resulted in a miscarriage of justice within the meaning of California Constitution, article VI, section 4½."

Under the instructions given, the jury was told that malice aforethought was a necessary element of murder, and the instructions permitted the jury to find such malice not only on the basis of the felony-murder rule but also if the killing was committed under circumstances that show an abandoned and malignant heart. To be so committed the defendant must have an intent with conscious disregard for life to commit acts likely to kill. (*People* v. *Washington,* 62 Cal.2d 777, 780 [44 Cal.Rptr. 442, 402 P.2d 130] ; see *People* v. *Thomas,* 41 Cal.2d 470, 475 [261 P.2d 1] [concurring opinion].)

There was ample evidence that defendant, a chiropractor, intended to induce Linda's parents to cancel the operation for her fast-growing eye cancer and place her under his care. Motive was shown by evidence that he was then behind in his rent and that he charged Linda's parents $500 in advance for her treatment and made an additional profit exceeding $100 by selling pills for her at a 100 percent mark-up.

That defendant was well aware that canceling the surgery and placing the child under his care would endanger her life is apparent from his own testimony. He testified as follows : Before Linda was removed from the hospital he knew the form of cancer she had, and, having taken several semesters of pathology at school, he recognized that her condition was "very, very dangerous." He recalled having read that "early exenteration of the orbit offers the only hope of survival, and

that a slender one." He stated he was aware that Linda's case required medical attention, which he was not going to give her. Upon being told that the doctors at UCLA planned to perform surgery on her, he told her mother to listen to the doctors. Later, when Linda's mother informed him that she had removed Linda from the hospital, he told her she had made "a very, very grave mistake" and should return Linda to the hospital. Thereafter each time Linda was brought to him for treatment he stated that she should have surgery. He graduated from a college of chiropractic in 1958 and testified that he knew he could not cure cancer, and that if he had reason to believe that one of his patients had a malignant tumor he would refer the patient to a surgeon.

In view of the foregoing testimony by defendant any possibility the jury would have concluded, as suggested by the majority, that he believed the treatment he proposed to give would be as efficacious as the scheduled surgery in prolonging her life and thus that he did not act with conscious disregard for her life is so remote as to be virtually nonexistent.

The majority note that defendant testified that he understood that Linda's cancer was incurable, but this is not inconsistent with his testimony indicating his belief that surgery offered the best chance of *prolonging* her life. Moreover, his testimony relating to whether her form of cancer was curable, when the testimony is taken as a whole, merely indicated that he believed that such cancer was ordinarily incurable but that there was a slight chance of survival if there was early exenteration of the orbit.

The majority opinion is misleading in stating that "defendant testified that he . . . understood that surgery might stimulate the spread of the disease to other parts of the body and thus hasten death." Defendant testified that he had read that "after removal there is wasting and death due to metastasis . . . ," i.e. a transfer of the disease from one part of the body to another. The quoted matter which defendant said he had read may mean merely that removal does not always prevent death, not that removal might "stimulate" the spread of the disease and thus hasten death.

Defendant was indeed fortunate that he was not tried and convicted of first degree murder for Linda's death. Even if it be assumed that it was error to give the felony-murder instruction, the record shows that it is not reasonably probable that a result more favorable to defendant would have been reached had the instruction not been given. (*People* v. *Watson*, 46 Cal.2d 818, 835 [299 P.2d 243].) Since the giving of the

instruction did not result in a miscarriage of justice, I would affirm the judgment of conviction under the mandate of section 4½, article VI, of the California Constitution.

McComb, J., and Schauer, J.,* concurred.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.