677 P.2d 519

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Cyrus E. MAXFIELD,
Defendant-Appellant.**

**No. 14152.**

Court of Appeals of Idaho.

Feb. 29, 1984.

Klaus Wiebe, Ada County Public Defender, David Z. Nevin, Chief Appellate Deputy, Boise, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Boise, for plaintiff-respondent.

SWANSTROM, Judge.

Cyrus Maxfield is a naturopathic physician; but he is not, in fact, a licensed medical doctor. On October 26, 1979, eighty-six-year-old Lloyd Hill walked, with assistance, into Maxfield's office in Boise. After Hill related his various ailments to Maxfield, a "colonic irrigation," which consists of a series of tap water enemas, was performed by the "doctor" to relieve Hill's severe constipation. Hill became weak during this treatment and, when he left the office sometime later, he had to be carried to his car. Maxfield prescribed and dispensed Digitalis to Hill for an apparent heart condition, but never suggested that Hill enter a hospital. Instead, Hill's relatives were told by Maxfield that Lloyd was well enough to make the return trip to his home in Burns, Oregon. On the morning of October 27, Hill was admitted to a hospital in Burns where he died the next evening.

Following a jury trial, Maxfield was convicted of involuntary manslaughter, I.C. § 18–4006(2).[1] For this offense and for being a persistent violator under I.C. § 19–2514, Maxfield was sentenced to an indeterminate term of imprisonment not exceeding fifteen years. On appeal, the sole issue is whether there was sufficient evi-

---

**1.** Maxfield was charged in a twenty-one count information with crimes ranging from possession of controlled substances with intent to deliver and practicing medicine without a license to involuntary manslaughter. He was convicted on all counts. This appeal concerns only the involuntary manslaughter conviction.

dence to prove that Maxfield's conduct caused Hill's death. We affirm the judgment of conviction.

■ We note initially that the state must prove each element of a crime beyond a reasonable doubt. In homicide and related cases, this means proving: (1) a death, and (2) the defendant unlawfully caused that death. *State v. Cutler*, 94 Idaho 295, 486 P.2d 1008 (1971). In this case, the state charged that Maxfield had engaged in an unlawful act, the practice of medicine without a license, causing the death of Lloyd Hill. This unlawful act, in turn, was comprised of Maxfield's holding himself out as a doctor and prescribing drugs (Digitalis in this instance) which could only be prescribed lawfully by a doctor, administering the colonic irrigation as a form of medical treatment, and advising the patient as to whether his cardiac condition required emergency medical care.

This conduct by Maxfield is not controverted on appeal. Rather the narrow issue presented to us is whether the state proved that such conduct *caused* the life of Lloyd Hill to be shortened. Maxfield contends that the testimony of one doctor, William Owens, was the sole evidence on the question of causation. He further contends that because Dr. Owens testified only that the treatment by Maxfield *could have* caused Hill's acute heart failure, the evidence was insufficient to establish the requisite causation beyond a reasonable doubt.

> The standard of review on appeal is that where a jury verdict is supported by substantial, competent evidence, it will not be disturbed on appeal.... We are required to review the record to determine if such evidence exists and we are precluded from substituting our judgment for that of the jury as to the credibility of witnesses, the weight of the testimony, and the reasonable inferences to be drawn from the evidence.

*State v. Campbell*, 104 Idaho 705, 718–19, 662 P.2d 1149, 1162–63 (Ct.App.1983) (citations omitted). Furthermore, "[o]n appeal, where a defendant stands convicted, we view the evidence most favorably to the prosecution.... A mere possibility of innocence will not invalidate a verdict of guilty on appeal." *State v. Fenley*, 103 Idaho 199, 204, 646 P.2d 441, 446 (Ct.App. 1982) (citations omitted).

The medical testimony at trial was lengthy and complex. The doctor who performed the autopsy, George McGeary, testified that Hill died as a result of acute heart failure and pulmonary edema. He described pulmonary edema as a "manifestation of heart failure." Pulmonary edema occurs when the heart fails as a pump, causing a backup of fluid which is forced into the air passages of the lungs. Hill had long suffered from chronic heart failure and both Dr. McGeary and Dr. Owens testified that distension of the colon by means of an enema could aggravate or worsen heart failure. Dr. McGeary stated that but for the acute heart failure Hill would not have died when he did.

Dr. Owens was also asked a hypothetical question. In addition to the facts stated above, he was asked to assume that upon entering Maxfield's office Hill's complexion was normal, but that following the treatment he appeared cyanotic (i.e., his skin was a bluish color, indicating a lack of oxygen in the blood); and that Maxfield had told one of Hill's friends in the waiting room that Hill's "ticker" had "acted up" during the treatment. Each of these facts was derived from testimony at trial.

> Q  Dr. Owens, based upon the facts stated, do you have an opinion, to a reasonable medical certainty, as to whether it is probable that the treatment described would cause cardiac irregularities and an increase in heart failure?
>
> A  I think that it's probable that it could.
>
> Q  And why is that?
>
> A  From the features that I previously mentioned; primarily the colonic treatment which could increase the blood volume and increase heart failure, change the electrolytes and also cause cardiac irregularities from the rectal stimulation.

Later, Dr. Owens testified:

> Q  Discussing heart failure. Is it possible to have chronic heart failure or a

chronic condition and have something, an outside source cause something which would make that go into acute heart failure?

A  Yes.

Q  Could you elaborate on that?

A  Simple—okay.  Outside the medical field simple things such as stress, exercise, changes in altitude could worsen heart failure.

Q  Could an enema do that?

A  It could aggravate or worsen heart failure, yes.

Q  And how is that relationship established?

A  Again, I think I'd refer back to the three detrimental effects of an enema. In this particular condition primarily, stimulation or arrhythmias, the additional volume and the change in the serum electrolytes that it could affect—

On cross-examination, Dr. Owens testified:

Q  Now, I notice, Doctor, when you talk about the enema on direct examination you indicate again the three detrimental aspects;  that these could have happened. Is that correct?

A  Yes.

Q  You are not saying that they absolutely did happen?

A  It's difficult—well, there are some indications, yes, that there were detrimental effects that occurred at that time.

Q  But, nevertheless, your statement was this could have happened?  I believe your exact testimony was that it was probable?

A  Yes.

Q  Now, does that mean that you are not absolutely certain?

A  I would have to answer that first of all qualified that in medicine we are very seldom absolutely certain about a cause and effect of any disease process and outcome and so on.

We work on a reasonable degree of probability and there are indications from the hypothetical and the autopsy finding and the hospital records that there was a deterioration at the time of the enema.

■  We are constrained to agree with Maxfield that *this* testimony, by itself, was not the substantial, competent evidence required to support the jury's verdict.  It establishes no more than a probability that the treatment rendered by Maxfield caused Hill's death.  *Cf. Commonwealth v. Radford*, 428 Pa. 279, 236 A.2d 802 (1968) (proof that assault *probably* caused death was held insufficient).

Dr. Owens, however, expanded upon his testimony on redirect:

Q  And in this case, based upon the hypothetical with the facts that you have presented, as well as the entire hospital report and the entire autopsy report; that is Exhibits 213 and 106.

Have you formed an opinion, *to a reasonable medical certainty*, as to the relationship between that—in light of the fact that Lloyd Hill's complexion was described as not being unusual when he arrived and in a bluish condition when he leaves, as to a connection between that and the giant enema?

A  Yes.  I think it's reasonable to assume that *there was a cause and effect related to the enema* with the time frame and his worsened condition.  [Emphasis added.]

On re-cross, Dr. Owens further testified:

Q  If I understand your testimony correctly, are you saying that the enema or colonic was the cause of the heart failure?

A  No.

Q  Merely a certain degree, an aggravating factor?

A  Yes.

Q  An unknown degree of an aggravating factor?

A  Yes

Q  You can't tell me with any degree of certainty just how much that condition was aggravated by the colonic or the enema?

A I would have to say it would be a fairly severe degree; enough to cause cyanosis.

We believe these additional passages indicate that Dr. Owens established, to a reasonable medical certainty, a causal relationship between the enema treatment and the deterioration of Hill's condition. The jury's justifiable inference that Hill's worsened condition led to his death, derived from the facts that Hill had to be hospitalized the morning after the treatment and that he died soon thereafter, completes the causal chain. We are not required to reverse, however, simply because the doctor's testimony was couched in terms of "reasonable medical certainty" rather than of "beyond a reasonable doubt." *People v. Phillips,* 64 Cal.2d 574, 51 Cal.Rptr. 225, 414 P.2d 353 (1966). Rarely, as Dr. Owens stated, are doctors absolutely certain about the cause and effect of a disease process.

Dr. Owens testified that to a reasonable medical certainty the enema treatment worsened Hill's heart failure. In his opinion the "vast majority" of the pulmonary edema was due to heart failure. He said that even if—as some evidence suggested—the pulmonary edema was not readily discernible when Hill was admitted to the Oregon hospital, the enema could have nevertheless caused the heart failure and the resulting pulmonary edema. The autopsy demonstrated that one of the causes of death was pulmonary edema.

There was also testimony that Hill suffered from chronic heart failure and that he died of acute heart failure. Dr. Owens stated that acute heart failure develops suddenly, from within minutes to hours after the stimulus which precipitates the heart failure occurs. He further testified that the existence of cyanosis, manifested when Hill was leaving Maxfield's office, indicates "an acute process going on at that time." Dr. McGeary testified that distension of the colon "would have an affect on slowing the heart and causing the heart to have more frequent arrhythmias or ... irregular beats...." Cardiac arrhythmias are irregular or extra heartbeats that do not pump blood as effectively as a normal heartbeat. Since heart failure is a condition in which the heart "fails as a pump," i.e., pumps inefficiently, the jury could justifiably infer that frequent arrhythmias would necessarily aggravate the condition of someone already suffering from chronic heart failure.

■ Thus, while other things, such as stress or exertion, could have aggravated Hill's condition, the proximity in time of the enema treatment and the visible deterioration of Hill's condition justified the reasonable inference that the former caused the latter. *Cf. State v. Greensweig,* 103 Idaho 50, 644 P.2d 372 (Ct.App.1982) (intent to commit a crime can be inferred by a jury from a defendant's actions). The mere fact that death may have resulted from the combined effects of the enema treatment and some other cause or pre-existing condition would not relieve Maxfield of criminal responsibility. *Armstrong v. State,* 502 P.2d 440 (Alaska 1972).

We conclude that the state's evidence was sufficient to support a permissible inference of causation by the jury. Accordingly, the jury verdict will not be disturbed on appeal. The judgment of conviction is affirmed.

WALTERS, C.J., and BURNETT, J., concur.