James **RICHARDSON**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 04–90–00674–CR.

Court of Appeals of Texas,
San Antonio.

Jan. 8, 1992.

Rehearing Denied March 4, 1992.

Ron D. Ross, San Antonio, for appellant.

Fred G. Rodriguez, Former Crim. Dist. Atty., Steven C. Hilbig, Crim. Dist. Atty., Daniel Thornberry, Edwin Springer, Mary Ellen Smyth, Asst. Crim. Dist. Attys., San Antonio, for appellee.

Before BUTTS, BIERY and CARR, JJ.

## OPINION

BUTTS, Justice.

This is an appeal of a felony murder conviction. TEX.PENAL CODE ANN. § 19.02(a)(3) (Vernon 1989). After the jury returned a guilty verdict, the trial court assessed punishment at 50 years' imprisonment.

Appellant advances ten points of error. The first is that error resulted when the trial court denied the motion for mistrial urged after an officer testified that appellant had taken a polygraph test. The court had previously granted appellant's motion in limine to exclude all reference to a polygraph test and to so instruct State's witnesses.

The evidence shows that Henry Alonzo, a homicide detective, read appellant his *Miranda*[1] warnings. Appellant at first requested that an attorney be appointed for him. Alonzo requested legal advice at this point and was told to take appellant before a magistrate where his "rights" would be

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

read and an attorney then appointed. Alonzo related this information to appellant who then said he would talk to the detective without an attorney "because he had nothing to hide and he had done nothing wrong." This is the exchange at trial as the prosecutor questioned Alonzo:

> Q. Did you talk to him and then reduce it to writing?
>
> A. Yes, I did. I questioned him first and I think after that he submitted to a polygraph test and then came back. . . .

Defense counsel objected; the court excused the jury. Defense counsel requested a mistrial. The prosecutor claimed "it was a big surprise," and he did not know the detective was going to say that. He had not cautioned the officer, but he did not think the officer would say that. The prosecutor noted it was not in response to a direct question about a polygraph. He also pointed out that, in good faith, the State had deleted any mention of polygraph in appellant's statement. The trial court re-read the officer's answer. Defense counsel renewed his motion for mistrial.

The trial court ruled, sustaining the objection and denying the motion for mistrial. The court instructed the jury to disregard any comments the officer made concerning a polygraph examination.

The State offered in evidence appellant's statement, with deletions, to which, after some discussion, defense stated "no objections." Later, under the rule of optional completeness, defense offered the same statement including most of the deleted portions.[2]

It is established law that results of polygraph tests are not admissible at trial. *See Nethery v. State*, 692 S.W.2d 686, 700 (Tex. Crim.App.1985), *cert. denied*, 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986). However, where a witness gives an unresponsive answer which mentions a polygraph test but does not mention the results of such test, there is no error in failing to grant a mistrial where the objection has been sustained and the jury instructed to disregard. *Richardson v. State*, 624 S.W.2d 912, 914 (Tex.Crim.App.1981), *citing Marini v. State*, 593 S.W.2d 709 (Tex. Crim.App.1980); *Reed v. State*, 522 S.W.2d 466 (Tex.Crim.App.1975); *Roper v. State*, 375 S.W.2d 454 (Tex.Crim.App.1964). There was no mention of the results of the test in the present case. There was no other reference to "polygraph" during this trial following the prompt instruction. In addition, at the motion for new trial hearing a juror denied that the members had considered anything about a polygraph test. Point of error one is overruled.

---

**2.** The statement, in its entirety, recounted that on October 25, 1989, about 11:30 a.m. appellant and David Sutton left the drug rehabilitation center where appellant was treated for drug dependency and went to a store by a gas station. He and David saw a young man (the complainant, Cabellero) drive up in a red Jeep Wagon, leave it with the motor running, and go inside. Appellant stated that it was David who got in the Jeep and that he told David not to do it. He said Cabellero held onto the driver's door, that David backed the Jeep and then "floored" the gas pedal. The Jeep went on Roosevelt Avenue with "the man's feet flying off the ground." Appellant stated he got scared, grabbed his tote bag and left. He soon saw the Jeep returning, and he got in. They went to a convenience store, bought beer and gas.

Some time later they drove to the West Side to buy some drugs. In the meantime they found a checkbook in the Jeep. They asked a man if he would help them cash a check. On the way to a bank appellant saw his friend Roy buying drugs from a third person. They picked up Roy. At San Antonio Savings on Commerce Street one of the group wrote a check, and David and the stranger went inside and cashed the check. "Money changed hands." Then they drove to a pawn shop where appellant sold the spare tire and cassette tapes from the Jeep.

On their way to a friend's house they saw a cop and they "dumped" the Jeep, with appellant retaining the keys. They went to an H.E.B. store where appellant telephoned the drug rehabilitation people to come and get him. On the way to the center, when they passed by the Jeep, a tow truck was there, and appellant tossed out the Jeep keys. The drug rehabilitation worker became suspicious and, not wanting to aid them, dropped the two off at a store on General McMullen. Appellant and David then went to a bar for beer, called a taxi, and went to the rehabilitation center. Confronted with the Jeep keys which the worker had retrieved, appellant denied any knowledge about them. He thereafter got the keys and threw them in the trash. He stated he has not seen David again.

Appellant submits the next four points of error under one argument. The court charged the jury pursuant to the indictment allegations.[3] It is argued that "acts clearly dangerous to human life," which were alleged as "did drive and continue to drive said motor vehicle while Richard Caballero was outside said motor vehicle holding onto said motor vehicle", were not supported by any evidence that appellant committed the acts. Appellant is attacking the sufficiency of the evidence to support submission of different theories in the jury charge: appellant drove and continued to drive while the complainant held onto the outside of the Jeep Wagon, causing complainant to fall to the ground and thereby causing his death; and, appellant drove and continued to drive the Jeep while the complainant held on, thereby causing complainant to fall and be run over by the Jeep, thereby causing complainant's death.

In points two and four, appellant contends that the evidence is insufficient to prove appellant committed the said acts and that the intervention of complainant was the cause of his own death (his own commission of acts clearly dangerous to human life). In points three and five it is argued that the State failed to allege and prove an act clearly dangerous to human life apart from the underlying felony of unauthorized use of a motor vehicle (the merger doctrine).

The evidence reflects that the complainant ran from the store and grabbed onto the Jeep, hanging on the driver's side as the vehicle was driven away. The main defense theory was that it was not appellant who drove the Jeep, rather, it was his companion, David Sutton. Two witnesses testified that it was appellant who got in

the parked Jeep on the driver's side. Witness, Rosafina Guerra, said the driver "took off real fast" with the complainant hanging on. Then she saw the man fall to the ground on Roosevelt Avenue. There was other testimony that the Jeep was swaying from side to side. There was also testimony that the driver was hitting at and striking Caballero. Guerra stated that the rear wheel "bumped" the man, while two other witnesses stated that the rear wheel ran over the man's head.

Yet another witness, Jesse Vasquez, testified he saw appellant later the same day driving a Jeep. Appellant told Vasquez he stole the Jeep outside a store, the owner came running out, and that he had run over the owner.

The medical examiner testified that the cause of death was injury to the skull and brain; complainant also suffered a crushed chest. The medical examiner stated the crushed chest injuries could result from being run over. He also agreed the head and brain injuries were consistent with a person falling from a moving vehicle, hitting the ground, or being run over. It was his opinion that the fall under these circumstances could have severely damaged the brain and resulted in fatal injuries. Or, he acceded, the head being struck by the wheel could have been fatal.

Appellant argues that driving the vehicle constituted inaction and a non-dangerous act in regard to the death, that it was complainant's intervention which resulted in his death.

### The Felony Murder Rule

■ Texas has codified the felony murder rule:

3. Omitting formal parts, the indictment alleges that appellant did:

commit and attempt to commit the felony offense of unauthorized use of a motor vehicle by then and there knowingly and intentionally operating [the Jeep owned by Caballero without his consent]; and while in the course of and furtherance of the commission and attempted commission of said offense, did then and there commit an act clearly dangerous to human life, to wit: did drive and continued to drive said motor vehicle

while Richard Caballero was outside said motor vehicle holding onto said motor vehicle, and by hitting and striking Richard Caballero as he held onto the motor vehicle while [appellant] drove and continued to drive said motor vehicle; causing Richard Caballero to fall from said motor vehicle and to hit the ground and causing Richard Caballero to fall and be run over by said motor vehicle; thereby causing the death of Richard Caballero;
. . . .

(a) A person commits an offense if he:

\*     \*     \*     \*     \*     \*

(3) commits or attempts to commit a felony, other than voluntary or involuntary manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX.PENAL CODE ANN. § 19.02(a)(3). Accordingly, a person may be found guilty of murder when his felonious conduct brings about an unintended death. Texas limits the applicability of the statute to those homicides where there is a causal connection between the conduct and the death; the death is caused contemporaneously with, or in furtherance of, the commission or attempt, or immediately after commission of the underlying felony; the underlying felony is independent of the homicide; and, the underlying felony is neither voluntary nor involuntary manslaughter.

Although some states have specified that only certain kinds of felonies will suffice as the underlying felony, Texas is not one of those. For instance, in *People v. Phillips*, 64 Cal.2d 574, 51 Cal.Rptr. 225, 414 P.2d 353 (1966) the felony was viewed in the abstract to determine whether it was inherently dangerous to human life. Other states look to the facts of each particular case and determine whether the felony is dangerous to human life. *See e.g. State v. Wallace*, 333 A.2d 72 (Me.1975). Still other states authorize any felony as the underlying one, so that, for instance, the underlying felony of theft could trigger the application of the felony murder rule, as in *State v. Chambers*, 524 S.W.2d 826 (Mo. 1975).

As stated in *Rodriguez v. State*, 548 S.W.2d 26, 29 (Tex.Crim.App.1977), "[T]he legislature has seen fit to exempt only the felonies of voluntary and involuntary manslaughter, and we will not add to the statutory exemption." Thus, Texas authorizes any felony, except the designated manslaughters, to be the underlying felony in applying the felony murder rule.

The culpable mental state for the act of murder is supplied by the mental state accompanying the underlying committed or attempted felony giving rise to the act. The transference of the mental element establishing criminal responsibility for the original act to the resulting act conforms to and preserves the traditional mens rea requirement of the criminal law. *Id.*

### The Merger Doctrine

With these principles in mind, we next examine the merger doctrine as argued in this case. The felony murder rule will not apply where the underlying felony sought to be used as a basis for the operation of the rule is an offense included in fact in the homicide itself. Where there exists no general mens rea based upon proof of the commission of a separate felony which may be transferred from that crime to an independent homicide committed in the course thereof, the felony murder rule cannot apply because there is a "merger" of the two offenses.

An example of the merger doctrine operating as a bar is found in *Garrett v. State*, 573 S.W.2d 543 (Tex.Crim.App.1978). There it was held that aggravated assault and the act resulting in the homicide in that case were one and the same, an indivisible transaction. There must be a showing of felonious criminal conduct [as the underlying felony] other than the assault causing the homicide. *Id.* at 546.

An example of a felony murder case where the merger doctrine presents no bar is *Murphy v. State*, 665 S.W.2d 116 (Tex. Crim.App.1983), *cert denied*, 469 U.S. 821, 105 S.Ct. 93, 83 L.Ed.2d 40 (1984). There the defendant was engaged in felonious conduct, arson, at the time the deceased was killed. There was therefore a showing of felonious criminal conduct which was not the same as the resulting homicide of the victim. The defendant attempted to set fire to a house in order to destroy it and collect insurance money, a property offense, and in the furtherance of such offense, the deceased was killed. *Id.* at 119.

■ In the present case appellant was engaged in the felonious criminal conduct of a property offense, unauthorized use of a motor vehicle, and during and in furtherance of that offense, complainant Caballero was killed. This theft offense, which is a property offense, is not an integral part of the homicide; it is not included in the homicide itself. Therefore, the merger doctrine does not operate as a bar in this case.

■ Applying the required standard for review of sufficiency of the evidence, we find the evidence in the present case as to the underlying offense, unauthorized use of a motor vehicle, a theft offense, TEX.PENAL CODE ANN. § 31.07 (Vernon 1989) to be sufficient to support the conviction. The evidence showed that appellant was the person who took the Jeep Wagon without the owner's consent. The jury so found and further found that appellant drove the Jeep while Caballero clung to the side. There was evidence that he hit at and struck Caballero as he drove from the parking lot and continued at a high rate of speed on the street. The acts of appellant, including the driving, were voluntary, willful acts. The jury could conclude that the acts were clearly dangerous to human life. Appellant made no attempt to stop the vehicle while Caballero, whom he knew was the owner, clung to it. Even when Caballero was dislodged and fell, and the Jeep struck him, appellant still did not stop. Instead he fled the scene. We find the evidence is sufficient to support the felony murder conviction, § 19.02(a)(3), *supra.* *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Valdez v. State,* 776 S.W.2d 162, 165 (Tex.Crim.App. 1989), *cert. denied.,* 495 U.S. 963, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990); *McQueen v. State,* 781 S.W.2d 600 (Tex.Crim.App.1989) (offense of unauthorized use of motor vehicle).

Points of error two through five are overruled.

■ In the sixth and seventh points of error appellant contends the trial court erred in submitting the theory that appellant hit and struck Caballero, causing him to fall, because there is no evidence to support the submission, and there is no evidence to support that finding.

Witness Maria Ingram, turning her car onto Roosevelt Avenue at the time, said the Jeep sped out in front of her with a man hanging on the door with his arms inside the window. The Jeep swayed from left to right, causing the man's body to keep hitting the vehicle. The Jeep went faster, and the man fell. Traveling behind the Jeep, she saw "hand motions" inside the Jeep before he fell. "[T]hey were fighting or I can't really say. But he—after there was hand motions, he had fell." She saw the Jeep run over the man's head. Then "the driver looked back and then took off to the next street ... sped up and just turned that corner." On cross-examination Ingram said, "There were a lot of hand motions. To me it appeared that they were fighting for the wheel." And later she opined, "He was either trying to knock him off or he could fall ..." The questioning continued:

Q. There was kind of a scuffle going on?

A. Yes.

Q. While he was driving?

A. Yes, sir.

\*　　\*　　\*　　\*　　\*　　\*

Dennis Glendenning, employed by the store, testified and identified appellant as the person who jumped into the Jeep and drove it with the complainant hanging on.

Rosafina Guerra had parked at the store at the time. While using the pay telephone, she saw a man go toward the Jeep and get in. She testified the owner came running out and hung on while the driver reversed the Jeep and "took off real fast.... And he would keep on—he was driving with one hand. The other hand he would be hitting him like that with the other elbow (indicating), trying to drop him...." Running out to an adjacent street, Guerra saw the complainant fall to the ground. She also saw the Jeep come back and the shorter companion, identified as David Sutton, run and get into the Jeep after that. Guerra identified appellant in

the courtroom as the one she saw drive the Jeep.

Dianne Moore testified she was driving on Roosevelt and saw the Jeep being driven about 45 miles an hour. She was going north; it was going south. She saw the complainant hanging onto the vehicle, off the driver's door. The Jeep sped up, she said, and the man fell, "and the Jeep went over his head."

Examining the evidence in the light most favorable to the verdict, we find that a trier of fact could have determined that appellant was the driver of the stolen Jeep, and the complainant fell as a result of being hit or struck by appellant. While there was a general verdict, there was evidence to support submission of that theory and evidence upon which the jury could have based the finding. *See Cook v. State*, 741 S.W.2d 928, 935 (Tex.Crim.App.1987), *vacated on other grounds*, 488 U.S. 807, 109 S.Ct. 39, 102 L.Ed.2d 19 (1988). No error is shown. The two points are overruled.

In his eighth and ninth points of error appellant maintains the theory that complainant's death was caused by his being run over by a motor vehicle was not supported by sufficient evidence, and the court erred in submitting that theory to the jury.

The court submitted four theories: Appellant drove the vehicle while Caballero was outside holding onto it, (1) causing him to fall *and hit the ground;* or (2) causing him to fall and be run over by the vehicle; or (3) appellant hit and struck Caballero as he held onto the vehicle causing Caballero to fall *and hit the ground;* or (4) causing Caballero to fall and be run over by the vehicle.

It is correct, as noted by appellant, that the medical examiner favored severe brain damage, which resulted from hitting the ground with such force as complainant fell from the moving vehicle, as the cause of death, as opposed to being run over. However, as previously declared, this was a general verdict. *See Cook, supra,* 741 S.W.2d at 935. There was sufficient evidence, as noted above, to submit the four theories. Moreover, the theory that death

resulted when complainant hit the ground is not disputed; it is supported by the medical examiner's testimony. The two points are overruled.

In his final point of error appellant asserts that fundamental error occurred at the sentencing hearing; he was denied due process because the probation department exceeded its authority and *ex parte* put potentially inadmissible evidence before the court.

Appellant filed his application for probation. The probation officer, after interviewing appellant, requested a psychological evaluation. Appellant was tested by an assistant to the psychologist. The results were submitted to the psychologist. At the sentencing hearing appellant objected because he did not know the assistant's qualifications to administer tests on which the psychologist would base his opinion. The court responded, "It's before the Court. I have got it in written form." The objection was overruled.

■ Appellant objected then that the information was supplied to the court *ex parte*, prior to the hearing, and was a violation of the Rules of Criminal Evidence. The objection was overruled, and the psychologist testified.

The constitutional objection now urged on appeal is not the same one made at the sentencing hearing. Failure to object on the grounds urged on appeal waives error, if any; this is true even though the error may concern a constitutional right of the defendant. *See Little v. State,* 758 S.W.2d 551, 563 (Tex.Crim.App.), *cert. denied,* 488 U.S. 934, 109 S.Ct. 328, 102 L.Ed.2d 346 (1988).

■ In addition, this does not constitute fundamental error. An accused is not denied due process of law when a trial court follows the "age-old practice of seeking information from out-of-court sources to guide [its] judgment toward a more enlightened and just sentence." *Tamminen v. State,* 653 S.W.2d 799, 802 (Tex.Crim.App. 1983), quoting *Williams v. New York,* 337 U.S. 241, 251–52, 69 S.Ct. 1079, 1085, 93 L.Ed. 1337 (1949). Here even though the

trial court did not order the psychological evaluation, the court could hear the pre-sentence evidence. That evidence arose as a result of appellant seeking probation from the court. Consequently, the court did not abuse its discretion by hearing the evidence. No error has been shown. Point ten is overruled.