

# NUMBER 13-18-00163-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

STEVEN DOUGHERTY,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                  Appellee.

### On appeal from the 156th District Court
### of Bee County, Texas.

# MEMORANDUM OPINION
### Before Justices Benavides, Hinojosa, and Perkes
### Memorandum Opinion by Justice Benavides

Appellant Steven Dougherty appeals his conviction for aggravated sexual assault of a child, a first-degree felony. *See* TEX. PENAL CODE ANN. § 22.021. By eight issues, Dougherty argues that the trial court erred by admitting and excluding evidence, denying his right to compulsory process by quashing a defense subpoena, and by denying his motion for mistrial. Finally, Dougherty contends that the evidence is insufficient to

support his conviction for a first-degree felony, although he concedes it is sufficient for a lesser offense. We affirm.[1]

## I. BACKGROUND

In June 2016, Dougherty was indicted on one count of aggravated sexual assault of S.H.L., a child under fourteen years old, that occurred on or about December 16, 2011. *See id.* At the time Dougherty allegedly assaulted S.H.L., he was a Catholic priest. Sometime after his indictment, S.H.L. filed a civil suit seeking damages against Dougherty, the Diocese of Corpus Christi, and others.

According to trial testimony by Sheryl Hunt, S.H.L.'s mother, Dougherty owned the UGN Ranch in Bee County, Texas. He developed the UGN Ranch, including building a house for himself and the family of his friend and ranch foreman Jimmy Hunt, for a white-tail deer breeding business. Dougherty and Jimmy had been friends for decades. Their plan was for Dougherty to put up the capital and when the business began to make a profit, the men would split the profits. Until then, Dougherty paid all the expenses, including Jimmy's salary, utilities, and a housekeeper for the property, as well as the expenses of running the business. Jimmy, his wife Sheryl, and their granddaughter S.H.L. lived on the UGN Ranch.

Before moving to the UGN Ranch in 2009, Jimmy worked on a different Dougherty family ranch for Dougherty's sister who lived out-of-state. Dougherty usually spent one night a week at Jimmy's house on his sister's ranch and they all were considered family

[1] Although the State was granted several extensions of time to file its brief and was advised that the Court would decide the case based upon the record and briefing before the Court if its brief was not filed by August 15, 2019, the State elected not to file an appellee's brief.

2

according to Sheryl and S.H.L. Dougherty had known S.H.L. since she was approximately six years old when Jimmy and Sheryl gained custody of S.H.L. Dougherty paid for their lawyer in the custody proceedings.

In October 2013, Dougherty abruptly announced that he was selling the UGN Ranch and told Jimmy that he and his family would have to move. He provided Jimmy with a check for $290,000 in severance pay. The Hunts sued to stop the sale and to prevent their dispossession but were unsuccessful. In December 2013, they moved off the ranch and into town. They continued their litigation against Dougherty for half of the business but accepted $100,000 in settlement of their claims in January 2015.

According to Sheryl's trial testimony, before the Hunts moved off the UGN Ranch in December 2013, she was cleaning out a dresser in Dougherty's room that belonged to Jimmy's family when she found a pair of S.H.L.'s panties among Dougherty's things, along with a report card and other items that belonged to S.H.L.

S.H.L. testified that Dougherty raped her before Christmas the year she was thirteen. She was out of school early and home alone; Sheryl was at the grocery store; and her father was working. Later on, by reference to school calendars obtained by the Bee County Sherriff's Investigator, she narrowed the date down to December 16, 2011, the day school released early for Christmas break. She was outside around the swimming pool with the family dogs when Dougherty came home mid-day, which she said was unusual. He asked her to come into the house, and when she came in a little later, he asked her to come into his room because he wanted to show her something. She testified that she did not want to go, but he grabbed her by the arm, pulled her in, and

3

pushed her into a corner. He began taking her clothes off, threw her down on the bed, and raped her. During the assault, Dougherty exclaimed, "I'm so angry," but S.H.L. had no idea why he said that. Afterwards, she rolled away from him, grabbed her clothes, ran to her room, and locked herself in her bathroom. She later burned her panties in the burn barrel outside because they were bloody and she did not want to have to explain them to anyone. She did not tell anyone what happened until 2015.

S.H.L. was treated for a urinary tract infection (UTI) in early January 2012. Physician's assistant Teralea Jones who treated S.H.L. testified that a UTI is unusual in a child that age unless there are structural problems with the child's bladder or urethra or the child is sexually active. At that time, S.H.L.'s medical records reflect that she was having flank pain and lower abdominal pain which persisted for at least six weeks. S.H.L.'s records also reflected that in 2007, she was touched inappropriately by a teen aged male cousin who also abused her younger brother. S.H.L. testified that her cousin exposing himself to her did not upset her but that she went to counseling once afterwards.

S.H.L. began seeing Debra Sublett for counseling in April 2014 after a referral from Jones. S.H.L. also began medication for anxiety and depression in early April 2014. She had been treated for anxiety and depression for months without success by Jones at her family practice clinic. S.H.L. was having digestive issues and was taking medication for that as well in April 2014. According to Sublett's records, S.H.L. reported a history of early abuse by the teenage cousin and that her father had anger issues. In her initial session, S.H.L. also reported that Dougherty, who used to live with her family, made her uncomfortable. S.H.L. did not attend therapy regularly. Over fourteen months, she

attended approximately ten times. S.H.L. testified that she told Sublett on June 1, 2015, that Dougherty sexually assaulted her. After her outcry, she did not return to therapy.

About a week after she told Sublett that Dougherty sexually assaulted her, S.H.L. told Sheryl and they reported it to the Bee County Sheriff's Department. Sublett also reported S.H.L.'s outcry to the Department of Family and Protective Services (DFPS). At the time she reported it, Sublett believed that S.H.L. was raped when she was fifteen years old. She later realized that she made an assumption based upon S.H.L.'s vagueness about dates. When Sublett reported S.H.L.'s outcry to DFPS, she spoke to Rhonda Visser.

Bishop William Michael Mulvey of the Diocese of Corpus Christi testified at trial that he received a letter from a man who alleged Dougherty abused him when the letter writer was eight years' old. As a result of the letter, Bishop Mulvey called Dougherty into his office and asked him about the letter. Dougherty admitted that for several years before he became a priest he sexually abused the child. The meeting between Dougherty and Bishop Mulvey took place on December 15, 2011. Before the meeting concluded, Dougherty agreed that he would begin an administrative leave from the priesthood on December 16, 2011. The terms of the leave were set out in an Agreement for Leave From Priestly Ministry that both Dougherty and Bishop Mulvey signed on December 15, 2011. Dougherty was prohibited from celebrating mass publicly, from dressing in priestly garb, was required to reside at his private residence in Bee County and was prohibited from leaving the United States. He was not removed from the priesthood. Dougherty admitted at trial that he did not tell anyone about his

5

administrative leave. In March 2014, Dougherty entered into a further agreement with Bishop Mulvey whereby he would reside at Catholic Solitudes, a religious retreat in Duval County, based upon Dougherty's request.

Dougherty testified at trial and denied sexually assaulting S.H.L. He testified that the allegations were an attempt by her parents to extort money from him, noting that they came after settlement of the litigation over his sale of the UGN Ranch that was substantially less than her parents wanted. He also noted that she brought a civil suit against him and the Catholic Church seeking money damages.

Dougherty was originally tried in March 2017, but the jury could not reach a verdict. Dougherty's retrial began in February 2018. Dougherty was convicted and sentenced to sixty years' imprisonment in the Texas Department of Criminal Justice-Institutional Division. He appeals his conviction.

## II. CONFRONTATION CLAUSE

By issue one, Dougherty complains that the trial court admitted a signed letter at trial from a man who alleged Dougherty sexually abused him thirty-five years earlier when the writer was eight years old. Although the letter writer did not testify at trial, he provided details of the events, and of his family. Dougherty originally objected outside the presence of the jury on multiple grounds including that the witness was not present to be cross-examined regarding the assertions in the letter. *See* U.S. CONST. amend. VI. Dougherty renewed his objections before the jury, and the trial court again overruled them.

6

## A.    Standard of Review and Applicable Law

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Crawford v. Washington*, 541 U.S. 36, 42 (2004). The *Crawford* Court determined that only those statements that are testimonial are entitled to the protection of the Confrontation Clause. *Id.* at 68. "Although we defer to a trial court's determination of historical facts and credibility, we review a constitutional legal ruling, i.e. whether a statement is testimonial or non-testimonial, de novo." *Wall v. State*, 184 S.W.3d 730, 742–43 (Tex. Crim. App. 2006).

Testimonial statements include: "ex parte in-court testimony or functional equivalents such as affidavits, custodial statements, prior examinations where the defendant was unable to cross-examine, or similar pre-trial statements that declarants would reasonably expect to be used prosecutorially." *Almaguer v. State*, 492 S.W.3d 338, 356 (Tex. App.—Corpus Christi–Edinburg 2014, pet. ref'd). "Generally speaking, a hearsay statement is 'testimonial' when the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008) (citing *Davis v. Washington*, 547 U.S. 813 822–23 (2006)). When the primary purpose of a statement is something other than criminal investigation, "the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination." *Michigan v. Bryant*, 562 U.S. 344, 361 (2011). If the statement is non-testimonial, admitting the statement does not violate the

7

Confrontation Clause. *Id.*; *see also Trejo v. State*, No. 13-10-00374-CR, 2012 WL 3761895, at *2 (Tex. App.—Corpus Christi–Edinburg Aug. 30, 2012, pet. ref'd) (mem. op., not designated for publication).

## B.   Discussion

The letter Daugherty complains of was not written to law enforcement.   According to the writer, the letter was designed for use by Bishop Mulvey within the Catholic Church for the purpose of protecting others from Dougherty and on the recommendation of the writer's therapist as part of his recovery from the abuse.   Bishop Mulvey received the letter in 2011, years before S.H.L.'s outcry.   Because the writer's primary purpose was not a criminal investigation, the trial court properly overruled Dougherty's objection.   *See Bryant*, 562 U.S. at 361; *De La Paz*, 273 S.W.3d at 680; *Lollis v. State*, 232 S.W.3d 803, 808–09 (Tex. App.—Texarkana 2007, no pet.) (holding statements made by a five and a seven-year-old were nontestimonial because the statements were made "in the course of treatment to deal with behavioral problems and abuse issues").

We overrule Dougherty's first issue.

### III.   EVIDENTIARY ISSUES

By issues two through four, Dougherty complains of the admission of the same letter discussed previously.   Defense counsel objected to its admission on multiple grounds including lack of authenticity, hearsay, Rule 403, and the trial court's failure to conduct a hearing pursuant to article 38.37.   *See* TEX. CODE CRIM. PROC. ANN. art. 38.37; TEX. R. EVID. 403, 802, 901.

8

**A.    Standard of Review and Applicable Law**

An appellate court reviews a trial court's evidentiary ruling for an abuse of discretion and will not reverse that decision absent an abuse of discretion.    *See Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005); *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); *Epps v. State*, 24 S.W.3d 872, 879 (Tex. App.—Corpus Christi–Edinburg 2000, pet. ref'd).    "The trial court abuses its discretion when [its] decision lies outside the zone of reasonable disagreement."    *McCarty v. State*, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008).

**B.    Extraneous Offense**

**1.    Authenticity**

By issue two, Dougherty complains that the trial court admitted the letter without requiring the State to establish its authenticity.    Bishop Mulvey testified that he received the letter.    When he questioned Dougherty about it, Dougherty admitted that the facts were true to Bishop Mulvey and later admitted they were true during trial.    Rule 901 provides that the proponent of evidence "must produce evidence sufficient to support a finding that the item is what the proponent claims it is."    Tex. R. Evid. 901.    Rule 901(b)(4) provides examples of evidence that satisfies the requirements to establish authenticity, which includes: "The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."    *Id.* R. 901(b)(4).

Dougherty testified there were only a handful of people who knew about the abuse. Dougherty's admission that he committed the acts as alleged in the letter combined with

9

the information in the letter that was known to few other than Dougherty sufficiently authenticated the letter. *Id.; see United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993) (holding that contents of a document may be used to authenticate it).

We overrule Dougherty's second issue.

### 2. Rule 403

By issue three, Dougherty argues that admission of evidence that he molested a different child thirty-five years earlier was substantially more prejudicial than probative. Rule 403 allows a trial court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." TEX. R. EVID. 403; *Robisheaux v. State*, 483 S.W.3d 205, 211–12 (Tex. App.—Austin 2016, pet. ref'd).

A trial court performing a Rule 403 analysis should balance the following factors, but need not do so on the record:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). Although there are differences between the two instances of sexual assault and the sexual abuse of the letter writer that took place years before the assault on S.H.L., there were also similarities. Dougherty lived with the families of both children and had access to and a relationship

with each child before the abuse/assault. He was considered a trusted friend of the family in both cases. He swore the child to secrecy in each case. He employed the child's parent and directly or indirectly provided the family's home in both cases. These similarities provided a probative value in addition to Dougherty's proclivity to have sexual relations with children. *See Bass v. State*, 270 S.W.3d 557, 563–64 (Tex. Crim. App. 2008).

Throughout these proceedings, Dougherty alleged that S.H.L. and her family were liars and out to get him financially. He denied committing the sexual assault. As a result, the State had need for the evidence to rebut Dougherty's claim that S.H.L. lied. In addition, the receipt of the letter prompted the Catholic Church to remove Dougherty from priestly duties. *See id.* That removal became effective on the date S.H.L. was sexually assaulted. Dougherty's removal from priestly duties also explains S.H.L.'s testimony that Dougherty said, "I'm so angry!" while assaulting her. Evidence regarding the letter took a short amount of the jury's time, sixteen pages out of the seven-day trial, according to the reporter's record. *See Gigliobianco*, 210 S.W.3d at 642.

The jury was given an instruction regarding the extraneous offense that advised them they could not consider that evidence unless they believed beyond a reasonable doubt that Dougherty committed the extraneous offense. Under these circumstances, the trial court did not abuse its discretion in allowing the evidence under Rule 403.

We overrule Dougherty's third issue.

### 3. Article 38.37 Hearing

By his fourth issue, Dougherty argues that the trial court abused its discretion by

failing to hold an article 38.37 hearing outside the presence of the jury. *See* Tex. Code Crim. Proc. Ann. art. 38.37 § 2-a. Before the first trial that ended in a hung jury, the trial court convened an article 38.37 hearing to consider the admissibility of the extraneous offense evidence raised by the letter. See *id.* The purpose of the hearing is to "determine that the evidence likely to be admitted at trial will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt." *Id.* Dougherty admitted to Bishop Mulvey that he committed the extraneous conduct and the trial court ruled the conduct admissible. Before the second trial, Dougherty's counsel requested a second hearing. The trial court declined to hold a second hearing and adopted the ruling of the previous trial judge. The trial court did not abuse its discretion by doing so. *See Carmichael v. State*, 505 S.W.3d 95, 101 (Tex. App.—San Antonio 2016, pet. ref'd); *see also Jurado v. State*, No. , 2019 WL 1922757, at *8 (Tex. App.—El Paso Apr. 30, 2019, no pet.) (holding that trial court did not abuse its discretion in failing to hold article 38.37 § 2-a hearing where judgment conclusively established defendant committed extraneous offense). We overrule Dougherty's fourth issue.

### III. EXCLUSION OF DEFENSE WITNESS

By issues five and six, Dougherty challenges the trial court's refusal to allow Visser, a DFPS witness, to testify that she received a report that S.H.L. was sexually assaulted when she was fifteen years old. He complains that his right to compulsory process was violated and that the trial court reversibly erred. We consider both issues together.

12

**A.     Standard of Review**

The Sixth Amendment guarantees a defendant the right to offer witness testimony, to compel the attendance of witnesses, to confront, and to cross-examine witnesses. *See* U.S. CONST. amend. VI; *Washington v. Texas*, 388 U.S. 14, 18–19 (1967).   A defendant also has a fundamental right to present evidence of a defense as long as the evidence is relevant and is not excluded by an established evidentiary rule.   *See Miller v. State*, 36 S.W.3d 503, 507 (Tex. Crim. App. 2001).

We review a trial court's ruling on a motion to quash a subpoena under an abuse-of-discretion standard.   *See Drew v. State*, 743 S.W.2d 207, 225 n.11 (Tex. Crim. App. 1987); *Torres v. State*, 424 S.W.3d 245, 261 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd).   The right of compulsory process is not absolute; a defendant carries the burden of a plausible showing by sworn or agreed facts that the testimony would be material and favorable.   *Coleman v. State*, 966 S.W.3d 525, 528 (Tex. Crim. App. 1998).   A trial court abuses its discretion by quashing a subpoena when a party has shown clear evidence or agreed facts that the testimony would be material and favorable to the defense.   *Id.*

**B.     Discussion**

Dougherty subpoenaed records from DFPS to reflect the outcry that Sublett reported confidentially.   The trial court held an evidentiary hearing in which DFPS presented evidence that the records had been purged in the ordinary course of business and DFPS could therefore, not authenticate the record.

Dougherty also subpoenaed Visser for trial and had a copy of the outcry report that he obtained from the State during criminal discovery.   The trial court heard Visser's

13

testimony outside the jury's presence.   Visser recalled receiving the report but was not permitted by law to reveal the identity of the caller although she admitted to the trial court that the reporter was not the victim of the assault.   The trial court therefore determined that Visser was not an outcry witness and had no personal knowledge.   In addition, she was unable to authenticate the report because she could not compare it with the one maintained by DFPS to ensure it had not been edited.   Although Dougherty argued that Visser could impeach Sublett's testimony by reciting what Sublett told her, the trial court concluded that Visser's testimony was hearsay, because Visser could only repeat what a third person told the caller.   *See* TEX. R. EVID. 602, 802; *Cheek v. State*, 119 S.W.3d 475, 479 (Tex. App.—El Paso 2003, no pet.).

Although a defendant has the constitutional right to present a defense and to compel witness testimony, that testimony must be admissible.   *See Miller*, 36 S.W.3d at 507; *Cheek*, 119 S.W.3d at 483 (refusing to allow defendant to present hearsay evidence as defense).   Because Visser's testimony was hearsay not subject to an exception, the trial court did not abuse its discretion by quashing the subpoena for Visser.

We overrule Dougherty's fifth and sixth issues.

## IV.  MISTRIAL

By issue seven, Dougherty argues that the trial court reversibly erred by denying his motion for mistrial after a State's witness testified that Dougherty had been offered a polygraph examination.   Before trial, the trial court granted the defense motion in limine that there be no mention of a polygraph examination being offered or refused before the jury.

14

## A. Standard of Review and Applicable Law

We review a trial court's decision to deny a mistrial under an abuse of discretion standard, and we review the facts in the light most favorable to the trial court's ruling. *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004); *see Russeau v. State*, 171 S.W.3d 871, 885 (Tex. Crim. App. 2005); *Ketchum v. State*, 199 S.W.3d 581, 599 (Tex. App.—Corpus Christi–Edinburg 2006, pet. ref'd). We uphold the trial court's ruling if that ruling was within the zone of reasonable disagreement. *Wead*, 129 S.W.3d at 129; *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). A mistrial is required only in "extreme circumstances" in which the prejudice is otherwise incurable. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). Generally, whether the error was such that it could not have been cured by an instruction and whether the prosecutor acted in reckless disregard of such error are "essentially factual questions." *State v. Lee*, 15 S.W.3d 921, 926 (Tex. Crim. App. 2000).

## B. Discussion

During defense questioning of Bee County Sheriff's Investigator Steve Linam, counsel questioned the thoroughness of Investigator Linam's investigation and whether he had done any investigation into S.H.L.'s reputation for truthfulness. During his cross-examination of S.H.L., defense counsel also questioned her about occasions on which she had not told her gynecologist that she was sexually active with her boyfriend and a time when she was much younger when she claimed to be dating Justin Bieber.

Defense counsel also asked Investigator Linam, "didn't you want to see if . . . [Dougherty] was truthful and had a reputation for being truthful?" Investigator Linam

15

responded, "I offered him a polygraph."   Defense counsel moved for a mistrial and noted that Investigator Linam violated a motion in limine.   The trial court sua sponte instructed the jury:

> I'm going to instruct you that that response was completely improper on the part of this witness.   None of that is admissible, whether it happened or not. It's not to be considered by you for any purpose.   Mr. Linam and I are going to have a discussion sometime later outside the presence of the jury.   But for right now, you can ask your next question.   Your motion is denied.

Defense counsel moved to strike Investigator Linam's response from the record which the trial court granted.   He renewed his motion for mistrial.   The trial court reminded him that his motion was denied and he should ask his next question.

Dougherty argues that Investigator Linam's answer was so prejudicial that the trial court's instruction could not have cured the prejudice.   However, there are numerous cases in which a witness gave a nonresponsive answer that mentioned that a polygraph test was offered or taken but did not mention the results.   In each case, the reviewing court held there was no error in failing to grant a mistrial.   *See, e.g.*, *Richardson v. State*, 624 S.W.2d 912, 914–915 (Tex. Crim. App. 1981) (no error where complainant stated in a nonresponsive answer to prosecutor's question that she had taken a polygraph exam); *Hannon v. State*, 475 S.W.2d 800, 803 (Tex. Crim. App. 1972) (no error where witness gave nonresponsive answer that indicated he had been put on a lie detector machine); *Martines v. State*, 371 S.W.3d 232, 252 (Tex. App.—Houston [1st Dist.] 2011, no pet) (holding that instruction to disregard was sufficient where mention of polygraph offer was inadvertent and did not mention result); *Barker v. State*, 740 S.W.2d 579, 583 (Tex. App.—Houston [1st Dist.] 1987, no pet.) (no error where officer's nonresponsive answer

16

to prosecutor's question that the defendant had been offered a polygraph exam).[2]   In each of these cases, the courts held that an instruction to disregard the answer was sufficient to reduce any persuasive effect that the answers might have had in the minds of the jurors.   Because we presume that jurors follow the instructions given by trial courts, the presumption may only be overcome by evidence that the jury disregarded the judge's instructions.   *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005); *James v. State*, 89 S.W.3d 86, 90 (Tex. App.—Corpus Christi–Edinburg 2002, no pet).   Dougherty has failed to provide any evidence to demonstrate that the jury ignored the trial court's instruction.

We overrule Dougherty's seventh issue.

## IV.   SUFFICIENCY OF THE EVIDENCE

By his eighth issue, Dougherty challenges the sufficiency of the evidence to support his conviction for a first-degree felony.   The indictment alleged that Dougherty sexually assaulted S.H.L., a child younger than fourteen years of age.   *See* TEX. PENAL CODE ANN. § 22.021(e).   Dougherty specifically challenges the evidence to support the element of age.   He argues that S.H.L. was fifteen, not thirteen when the rape occurred, which would change the offense from a first-degree felony to a second-degree felony. *Id.; c.f. id.* § 22.011(f) (sexual assault of a child younger than seventeen is a second-

---

[2] *See Roper v. State*, 375 S.W.2d 454, 457 (Tex. Crim. App. 1964) (no error where officer disclosed that defendant had been given a polygraph exam where answer was nonresponsive and did not reflect the result of the test); *Richardson v. State*, 823 S.W.2d 710, 712 (Tex. App.—San Antonio 1992, pet. ref'd) (no error where officer's nonresponsive answer to prosecutor's question that defendant submitted to polygraph exam); *see also Williamson v. State*, No. 13-12-294-CR, 2013 WL 3894982, at *2 (Tex. App.—Corpus Christi–Edinburg July 25, 2013, no pet.) (mem. op., not designated for publication); *Whatley v. State*, No. 13-07-568-CR, 2009 WL 1607813, at *4 (Tex. App.—Corpus Christi–Edinburg Jan. 29, 2009, pet. ref'd) (mem. op., not designated for publication).

17

degree felony).

**A.     Standard of Review**

The Court applies the sufficiency standard from *Jackson v. Virginia*, which requires

the reviewing court to "view[] the evidence in the light most favorable to the prosecution,"

to determine whether "*any* rational trier of fact could have found the essential elements

of the crime beyond a reasonable doubt."   *Brooks v. State*, 323 S.W.3d 893, 912 (Tex.

Crim. App. 2010) (citing *Jackson*, 443 U.S. 307, 319 (1979)).   When a reviewing court

views the evidence in the light most favorable to the verdict, it "is required to defer to the

jury's credibility and weight determinations because the jury is the *sole* judge of the

witnesses' credibility and the weight to be given their testimony."   *Id.* at 899.   "The

reviewing court must give deference to the responsibility of the trier of fact to fairly resolve

conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from

basic facts to ultimate facts."   *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)

(citing *Jackson*, 443 U.S. at 318–19).   If the record supports conflicting inferences, we

presume that the fact finder resolved the conflict in favor of the prosecution and defer to

that resolution.   *Garcia v. State*, 367 S.W.3d 684, 686–87 (Tex. Crim. App. 2012);

*Brooks*, 323 S.W.3d at 899.

**B.     Discussion**

S.H.L. testified that she and her family lived at the UGN Ranch while she was in

sixth through eighth grade.   Dougherty was there several times a week and weekends.

S.H.L. testified she was thirteen years old when Dougherty sexually assaulted her.   She

did not recall telling Sublett how old she was when Dougherty sexually assaulted her or

18

that she told Sheryl or Jimmy how old she was when the assault occurred. When she talked to Investigator Linam, she told him she was thirteen when it happened. She recalls being baptized several months after Dougherty assaulted her. She wanted to be baptized, in part to be cleansed. S.H.L. was baptized in April 2012 just after her fourteenth birthday. During cross-examination, S.H.L. admitted that when she spoke to Investigator Linam, she told him that the assault had taken place "at Christmas about two years ago," and he calculated that she would have been fifteen years old. She corrected him at some point and told him that she was thirteen years old.

Investigator Liman testified at trial that S.H.L. and Sheryl came into the Beeville Sherriff's Department to report the assault on June 15, 2015. During that report, S.H.L. reported a series of touchings beginning when she was seven years old that culminated with the sexual assault. She described Dougherty touching her on her leg when she was seven, trying to put his hand up her shirt, and touching her breasts over her bra when she was ten. S.H.L. pinned down the date of the sexual assault to a date between school letting out for Christmas break and Christmas day the year she was thirteen years old. S.H.L. first described the assault as taking place a couple of years ago. When Investigator Liman asked if she was fifteen at the time, she corrected him and told him she was thirteen. She repeated to him at least four times during the interview that she was thirteen when Dougherty assaulted her. Investigator Liman further testified that, especially when there is a delayed report of a crime, a complaining witness generally is not precise about the date unless it is on a holiday or a day with special significance. The witness can usually narrow it down by season or what grade they were in and then

19

the investigator will work with them to attempt to narrow down the time frame further. According to Investigator Liman, it was important to determine how old S.H.L. was at the time because it affected the classification of the assault. Investigator Liman determined that S.H.L.'s school let out at noon on December 16, 2011 for Christmas break when S.H.L. was thirteen.

Another witness, Bob Patten, a friend of both Dougherty and the Hunts, described a change in S.H.L.'s behavior from a friendly, sociable girl to one who became withdrawn at least six months or so before Dougherty sold the UGN Ranch in 2013.

S.H.L.'s aunt Tammi Lynn Johnson, testified that when she saw S.H.L. in September 2011, S.H.L. was her usual sociable, outgoing self. There was a reception at the house and S.H.L. was mingling with the guests, walking around, and making sure everyone had what they needed. She wanted to sing at the reception but did not have the opportunity.

Johnson next saw S.H.L. in May of 2012 and found her to be different, "very depressed, very clingy." She did not want to do the things that S.H.L. liked to do. S.H.L. was not eating and did not talk. According to Johnson, S.H.L. was much changed from six months earlier. When Johnson saw S.H.L. again in September 2012, S.H.L. appeared even more depressed.

Sheryl testified that Dougherty was part of the family and that on Christmas Eve, she cooked a big family meal and the family celebrated Christmas. In 2009, their first year at the UGN Ranch, Dougherty was with them and again in 2010, but he did not join them for Christmas Eve in 2011 and 2012. He did not tell her that he would not be there;

he just did not come.   Sheryl noticed a change in S.H.L. around Christmas 2011; she became withdrawn.   S.H.L. was having abdominal and back pain, but Sheryl could not get a medical appointment until January 2012.   Sheryl took her to see the doctor where they learned she had a UTI.   S.H.L. started staying in her bedroom a lot and did not want to go places.   S.H.L. had nightmares and was sick with headaches and vomiting.   She wanted to sleep with Sheryl and even volunteered to sleep on the floor in their room. S.H.L. quit ballet, gymnastics, swimming, and did not sing anymore.

Sublett testified that S.H.L. made an outcry to her on June 1, 2015 that Dougherty sexually assaulted her.   In her notes, Sublett wrote, "S.H.L. reported that on one occasion when she was still 15 years old, that while her parents were not home . . . [Dougherty] 'raped her.'"   Her notes also reflect that on June 15, 2015, Sublett made the mandated call to the Texas Abuse Hotline.   Sublett explained that she believed that the assault must have happened shortly before S.H.L. began seeing her, and she assumed that S.H.L. was fifteen at the time of the assault but did not know.   S.H.L.'s outcry happened in the last fifteen minutes of their session, and S.H.L. only told her the details of the actual assault.   Sublett hoped to clarify the remaining details at their next meeting.   Sublett did not realize her assumption until later.   Sublett's records also included notes from a call from Sheryl dated June 9, 2015, "Mrs. Hunt reported to me, also, that this incident had likely happened when S.H.L. was fifteen years old."

S.H.L. testified she was thirteen when Dougherty sexually assaulted her.   The jury resolved the contradictions in the evidence as it is required to do and there is sufficient evidence in the record to support its resolution.   *See Garcia*, 367 S.W.3d at 686–87;

21

*Brooks*, 323 S.W.3d at 899.

We overrule Dougherty's eighth issue.

## V.     CONCLUSION

We affirm the judgment of the trial court.


GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed the
12th day of September, 2019.