Filed 2/3/20
Opinion on rehearing

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>IGNACIO FRANCO PALOMAR III,<br><br>  Defendant and Appellant. | 2d Crim. No. B292450<br>(Super. Ct. No. 14C-38830)<br>(San Luis Obispo County)<br><br><br>OPINION ON REHEARING |

        Ignacio Franco Palomar III, appeals from the judgment entered after a jury convicted him of second degree murder. (Pen. Code, §§ 187, subd. (a), 189.)  The trial court found true allegations that he had been convicted of two prior serious felonies within the meaning of section 667, subdivision (a)(1), and two prior serious or violent felonies within the meaning of California's "Three Strikes" law.  (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d).)  The court dismissed one of the two strikes.  It sentenced appellant to an aggregate term of 40 years to life consisting of 30 years to life for second degree murder (15 years to life doubled because of the one strike), plus 10 years for the

two prior serious felony convictions within the meaning of section 667, subdivision (a)(1).

The murder charge was based on a theory of implied malice. Appellant contends that the evidence is insufficient to support the jury's finding of implied malice. We affirm.

*Facts*

"Viewing the entire record, as we must, in the light most favorable to the judgment and presuming in support thereof the existence of every fact the jury could have reasonably deduced from the evidence, we summarize the evidence as follows. [Citation.]" (*People v. Lozano* (1987) 192 Cal.App.3d 618, 621.)

One evening Erik Wolting and Gregory Rustigian went to a bar. Wolting estimated that Rustigian probably drank about 10 beers at the bar. When asked if Rustigian was intoxicated, Wolting responded, "He seemed like he was pretty buzzed."

Wolting introduced Rustigian to Rosa Lopez. Rustigian "raised his voice" and said "something derogatory" about Mexicans. Rustigian was white. Rosa Lopez "recoiled and you could see that she wasn't happy with what he said." She "was upset with him."

Appellant, Rosa Lopez's cousin, was inside the bar. Appellant is "a pretty big guy." David Aguayo, a bouncer at the bar, was worried that appellant was going to get into a fight with Rustigian. Aguayo told appellant, "[Y]ou know I'm working here now and if you're gonna do something, don't do it inside, Dude." Appellant threatened, "I'm gonna fuck homeboy up."

At about 11:30 p.m., Wolting and Rustigian left the bar. While they were getting ready to leave, Rosa Lopez's sister, Victoria Lopez, approached them and said, "'You guys are going to get jumped when you leave this bar.'" Rustigian did not take

2

the warning seriously.  He said to the bar's bouncers, "'Ooh, I'm going to [get] jumped --' 'We're going to get jumped when we walk out of here, ooh, I'm scared,' and he was laughing."  Wolting testified, "[I]t was a joke, he was jesting because he was pretty confident of himself."  Rustigian weighed about 225 pounds and was "pretty solid.  [He] [d]id construction [work] every day [and] went to the gym every day."  He was about five feet, ten inches tall.

Michael Knopf was another bouncer at the bar.  When Wolting and Rustigian left, Knopf heard Rustigian say:  "'I guess the Mexicans don't want us to be here.  God I hate fuckin' Mexicans.'"

Wolting and Rustigian were walking on a public street about 50 feet away from the bar.  Wolting "saw a shadow in back of us and . . . heard some noise."  He turned around and saw "a black figure, just a shadow, because it was dark."  Rustigian turned around at the same time.  He did not "make any kind of physical movement towards" the assailant.  The assailant punched Rustigian in the face.  Rustigian did not try "to take a swing [at] or . . . punch" the attacker.  It "was a matter of seconds" between the time that Wolting first "noticed the assailant" and the time that Rustigian "got punched."  Wolting was standing next to Rustigian.

Wolting was asked, "Was there time for [Rustigian] to have thrown a punch after you notic[ed] the assailant?"  Wolting replied:  "Hard to tell at that point, I don't think so, but I'm not 100 percent certain.  I didn't see [Rustigian] throw anything."  He also "didn't hear [Rustigian] say anything."  Wolting continued:  "All I remember is him getting punched once and that was it.  I think I would have recalled a scuffle, pretty darn certain that

3

would have been emblazed into my mind." "I know there was some dialog[ue] . . . I think it was brief, but I don't recall the content. . . . [I]t was definitely directed at [Rustigian] and not me." "[T]here was some dialog[ue] and then it all happened very quickly." The assailant "surprise[d] [us] as [we're] turning around, in my head that's what happened. That we were turning around, blank, blank, blank, blank, [Rustigian] gets hit."

After Rustigian was punched in the face, he "kind of jerked back, not too much, . . . but stayed standing erect and then fell down slowly." "[H]e closed his eyes and he started . . . falling backwards . . . towards the [concrete] curb." The back of Rustigian's head "connected with the edge of the curb[;] it sounded like a watermelon being dropped off a building."

"[T]he attacker turned around and walked away." Rosa Lopez told the police that appellant had admitted punching Rustigian.

Blood was coming from Rustigian's ears, mouth, and the back of his head. He was "having trouble breathing." Wolting "thought he was dying." Wolting "pull[ed] [Rustigian] off the curb because his head was dangling over the back edge of the curb." Wolting wanted to assure that "his head would be level instead of leaning back as he was gurgling." Wolting then called 911.

Wolting was asked to "describe the force of the punch." He replied: "[I]t had to be . . . incredibly powerful, because . . . [Rustigian] was a pretty solid, well-built, strong dude and . . . he rocked back pretty quick and passed out while standing up." "I saw his eyes close and him just falling back . . . , without being able to break his fall. His eyes were closed and he just teetered

4

over." Wolting heard a "thud when [Rustigian] got hit in the face." "The full force of the punch [was] absorbed into his face."

On the right side of his head, Rustigian had "[a] fracture of the occipital bone, which is in the back of the base of the head, the temporal bone, which is deep to the ear, [and] the sphenoid bone, which is kind of in the middle of the head." He also had a fracture of the "right orbit," the bone structure around the right eye. A doctor opined, "[T]he fracture extent of the orbit . . . goes into the sphenoid sinus and then into the temporal bone which would indicate one continuous fracture." The cause of death was "a very severe brain injury."

Appellant did not testify. He concedes "that the evidence supports a reasonable inference that he threw the punch that led to Rustigian's death." He also concedes "that a punch caused the victim to fall and strike his head on the concrete, resulting in a fatal head injury."

*Defense Counsel's Closing Argument to the Jury*

Defense counsel's closing argument to the jury included, inter alia, the following points:

(1) "[P]unching someone once, even if it's in the face, is not deadly force" and "is not inherently dangerous." "[T]hat is why boxing and MMA [mixed martial arts] is a youth sport taught to our boys and girls, . . . and at the heart of both boxing and MMA is punching people in the head."

(2) Appellant may have acted in self-defense when he punched Rustigian: "[Appellant] is not guilty of any of this if you find he was lawfully defending himself or reacting reasonably to something that Mr. Rustigian initiated." "[I]f you're . . . drunk, . . . and you're shouting out things like . . . 'I fuckin' hate Mexicans' you just might swing first if one of those Mexicans

5

follows you out of the bar."  "[W]hat are the chances that [Rustigian is] just going to . . . turn around swinging?"  "[W]e . . . don't know who threw the first punch . . . ."  It is reasonable to conclude that "Rustigian knew to be on guard [because of Victoria Lopez's warning that he was 'going to get jumped'] and [therefore] turned around swinging."

The jury rejected defense counsel's theories.  It found appellant guilty of second degree murder even though it had been instructed on both perfect and imperfect self-defense as well as the lesser included offense of voluntary manslaughter based on a killing committed "because of a sudden quarrel or in the heat of passion."  The jury was also instructed on involuntary manslaughter:  "When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter."

*Implied Malice*

"Murder is the unlawful killing of a human being or a fetus 'with malice aforethought.'  (Pen.Code, § 187, subd. (a).) . . . Malice may be either express (as when a defendant manifests a deliberate intention to take away the life of a fellow creature) or implied.  [Citation.]"  (*People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*).)

The prosecution of appellant for murder was based on a theory of implied malice.  "'Malice is implied when the killing is proximately caused by '"an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"'  [Citation.]  In short, implied malice requires a defendant's

6

awareness of engaging in conduct that endangers the life of another . . . .' [Citation.]" (*Cravens, supra,* 53 Cal.4th at p. 507.)

*Standard of Review*

Appellant claims that the evidence is insufficient to support the jury's finding of implied malice. "Our task is clear. 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]' . . . The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."' [Citation.]" (*Cravens, supra*, 53 Cal.4th at p. 508.) "All conflicts in the evidence are resolved in favor of the judgment . . . ." (*People v. Neely* (2009) 176 Cal.App.4th 787, 793.) "[W]e must . . . presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "''''"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." . . ."''' (*Cravens, supra*, at p. 508.)

*Cravens*

*Cravens* is the controlling authority. There, the "defendant 'came flying out' without warning and 'coldcocked' Kauanui" with

7

"a sucker punch" to the head.  (*Cravens*, *supra*, 53 Cal.4th at p. 509.)  At the time of the blow, Kauanui was standing in the street.  Witnesses "opined that Kauanui was unconscious from the blow before he hit the ground.  The punch was described by witnesses as 'extremely hard' and 'one of the hardest punches I've ever seen thrown.'  [One witness] added that '[i]t was a knockout. . . .  [A]ll you heard was like boom, like, from his head hitting the concrete. . . .'  Even the neighbors could hear the sound of his skull hitting the ground.  A pool of blood started to stream from the back of Kauanui's head." (*Id.* at p. 505.)  The defendant did not provide any assistance to Kauanui.  A companion drove defendant away from the scene.

"An ambulance took Kauanui to the hospital.  Kauanui had a blood-alcohol level of 0.17 percent when he was admitted, and his blood contained traces of marijuana." (*Cravens*, *supra*, 53 Cal.4th at p. 505.)  Kauanui died.  "The cause of death was blunt-force head injuries." (*Id.* at p. 506.)

The Supreme Court reversed the Court of Appeal's decision that the evidence was insufficient to support the defendant's conviction of second degree murder based on an implied malice theory.

*Substantial Evidence Supports the Finding*
*of Implied Malice*

"[W]e must determine whether there is sufficient evidence to satisfy both the physical and the mental components of implied malice, the physical component being "'the performance of 'an act, the natural consequences of which are dangerous to life,'"' and the mental component being "'the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.'"' [Citation.]  We

8

conclude that both components are satisfied here."  (*Cravens*, *supra*, 53 Cal.4th at p. 508.)

<u>The Physical Component of Implied Malice Is Satisfied</u>

"This state has long recognized 'that an assault with the fist . . . may be made in such a manner and under such circumstances as to make the killing murder.'  [Citation.]  However, 'if the blows causing death are inflicted with the fist, and there are no aggravating circumstances, the law will not raise the implication of malice aforethought, which must exist to make the crime murder.'  [Citation.]  Based on our review of the record, we find sufficient evidence that the manner of the assault and the circumstances under which it was made rendered the natural consequences of [appellant's] conduct dangerous to life."  (*Cravens*, *supra*, 53 Cal.4th at p. 508.)

"First, the record shows that [appellant] targeted a . . . victim who was [obviously] intoxicated . . . and [therefore] vulnerable."  (*Cravens*, *supra*, 53 Cal.4th at p. 508.)  Knopf, a bouncer at the bar, testified that Rustigian was "lightheaded, . . . buzzed" when he entered the bar.  Knopf said to Rustigian, "[Y]ou look a little buzzed."  Rustigian replied, "'We're a little buzzed,' . . . 'but we're not going to drink no more, we're good.'"  However, according to Wolting, Rustigian probably drank about 10 beers at the bar and "was pretty buzzed."  Victoria Lopez testified:  Rustigian "was just drunk" and "very intoxicated."  She "approach[ed] [Wolting] and said that . . . [Rustigian] is . . . really drunk and he's upsetting a lot of people."  Aguayo testified that Rustigian "was slamming [his] fist on the bar counter."  During closing argument to the jury, defense counsel said, "[T]here's no doubt [Rustigian] was highly intoxicated and it appears [appellant] was not intoxicated at all."  Since appellant observed

Rustigian's conduct inside the bar, he must have known that Rustigian was intoxicated.

Second, it is reasonable to infer that the blow delivered by appellant "was a very hard punch." (*Cravens*, *supra*, 53 Cal.4th at p. 509.) "The punch was hard enough to knock [Rustigian] unconscious, despite his [size] and fitness, even before he hit the ground." (*Ibid.*) Wolting heard a "thud when [Rustigian] got hit in the face." He testified that the punch must have been "incredibly powerful, because . . . [Rustigian] was a pretty solid, well-built, strong dude and . . . he . . . passed out while standing up."

Third, "[appellant's] conduct . . . guaranteed that [if Rustigian fell, he] would fall on a very hard surface, such as the pavement or the concrete curb. 'The consequences which would follow a fall upon a concrete walk must have been known to [appellant].' [Citations.]" (*Cravens*, *supra*, 53 Cal.4th at p. 509.)

Fourth, and "[p]erhaps worst of all, [appellant] decked [Rustigian] with a sucker punch."[1] (*Cravens*, *supra*, 53 Cal.4th at p. 509.) Appellant surreptitiously approached Rustigian from behind in the dark while he was walking away from the bar. Without warning, appellant punched him in the face before he had time to defend himself. "That [appellant] used a sucker punch here" shows that he "intended to catch [Rustigian] at his

---

[1] A "sucker punch" is "a punch made without warning or while the recipient is distracted, allowing no time for preparation or defense on the part of the recipient." <https://en.wikipedia.org /wiki/Sucker_punch> [as of Nov. 5, 2019], archived at <https://perma.cc/WA4A-7A5C>. In his opening brief appellant states, "Wolting initially told police that Rustigian was hit with a "'full on sucker punch'". . . ."

most vulnerable . . . ." (*Ibid*.) "The jury could reasonably have found that at the time [appellant] attacked, [Rustigian] posed no threat and was not behaving in an aggressive manner." (*Ibid*.) "[T]he record supported the jury's finding that [Rustigian] was . . . completely unaware that he needed to defend himself against a forceful punch, let alone a forceful punch to the head." (*Id*. at p. 510.)

Thus, "[c]onsidering the totality of the circumstances, . . . the jury could reasonably find that [the physical component of implied malice was satisfied because appellant's] act of violence was predictably dangerous to human life." (*Cravens*, *supra*, 53 Cal.4th at p. 510.) It is reasonable to infer that appellant delivered "an extremely powerful blow to the head calculated to catch the impaired victim off guard, without any opportunity for the victim to protect his head, and thereby deliver the victim directly and rapidly at his most vulnerable to a most unforgiving surface." (*Id*. at p. 511.)

The Mental Component of Implied Malice Is Satisfied

Sufficient evidence in "[t]he record also supports the jury's finding of the mental component of implied malice." (*Cravens*, *supra*, 53 Cal.4th at p. 511.) This component is satisfied if appellant knew that his conduct endangered Rustigian's life and he acted with a conscious disregard for life. (*Id*. at p. 508.) "This component is ordinarily proven by illustrating the circumstances leading to the ultimate deadly result." (*People v. Guillen* (2014) 227 Cal.App.4th 934, 988.)

"Of course, the jury was entitled to infer [appellant's] subjective awareness that his conduct endangered [Rustigian's] life from the circumstances of the attack alone, the natural consequences of which were dangerous to human life. [Citation.]

But [appellant's] behavior before and after [his punch] further demonstrated that this was not . . . a simple fistfight . . . .  These facts, too, bolstered the finding of implied malice.  [Citation.]" (*Cravens*, *supra*, 53 Cal.4th at p. 511.)

Before leaving the bar, appellant said to Aguayo, "I'm gonna fuck homeboy up."  Appellant must have boasted to Victoria Lopez that he was going to ambush Rustigian.  Otherwise, she would not have warned Wolting and Rustigian, "'You guys are going to get jumped when you leave this bar.'"  According to the American Heritage Dictionary, in this context "jump" means, "To spring upon in sudden attack; assault or ambush: *Muggers jumped him in the park*."  <https://www. ahdictionary.com/word/search.html?q=jump; see definition 3 under "v.tr."> [as of Nov. 5, 2019], archived at <https://perma. cc/Y8MC-VQGV>.

"Then, having knocked [Rustigian] unconscious and with his head split open on the ground, [appellant] took no steps to ascertain [Rustigian's] condition or to secure emergency assistance." (*Cravens*, *supra*, 53 Cal.4th at p. 511.)  Instead, he "turned around and walked away."  Appellant must have known that Rustigian had been severely injured.  Wolting testified that, when Rustigian's head hit the curb, "it sounded like a watermelon being dropped off a building."  Blood was coming from Rustigian's ears, mouth, and the back of his head.  By walking away without taking any measures to assist Rustigian, appellant manifested a callous indifference to human life.

*Reply to Dissenting Opinion*

Almost 80 years ago, Justice Raglan Tuttle said:  "The consequences which would follow a fall upon a concrete walk must have been known to appellant." (*People v. Efstathious*

12

(1941) 47 Cal.App.2d 441, 443.) Our Supreme Court has cited this case and this language with approval. The Court of Appeal, and then the Supreme Court, have recognized the obvious: When there are aggravating circumstances, an assailant who strikes a victim standing on concrete bears the risk that the victim will fall, hit his head upon concrete, and will die. Concrete has not gotten any softer in 80 years and appellant is chargeable with that knowledge.

The dissenting opinion asserts that *Cravens* is factually distinguishable. It reasons that appellant's sucker punch does not support a finding of implied malice because, unlike *Cravens*, the punch was not preceded by "a protracted assault by a group of men . . . includ[ing] threats, a chase, and a beating" that left the victim "virtually helpless." (Dis. opn., *post*, at p. 5.) But the key to understanding *Cravens* is not the prior group beating of the victim. The key is the victim's extreme vulnerability and the powerful sucker punch to the head delivered while the victim was standing on a concrete surface. Where, as here, these factors are present, the defendant cannot escape liability for implied-malice murder merely because the victim was not violently beaten before the sucker punch.

In *Cravens* the Supreme Court concluded that the evidence was sufficient to satisfy the elements of implied-malice murder. It did not suggest that the evidence would be insufficient under the factual scenario of the present case. The dissenting opinion disputes the jury's drawn inference that appellant must have been aware of the potentially lethal consequences that could result from Rustigian's fall to the concrete pavement: "Such an inference may reasonably flow when, as in *Cravens*, the victim has been chased, beaten, stomped and ultimately punched in the

13

face, a very different scenario from the instant case." (Dis. opn., *post*, at p. 3.) We cannot see why such an inference cannot be reasonably drawn here.

The Court of Appeal drew a similar inference in *People v. Efstathiou* (1941) 47 Cal.App.2d 441. There, the defendant worked as a cook at the victim's restaurant. Immediately after the victim had fired the defendant and left the restaurant, the defendant ran after him. They "exchanged blows with their fists . . . ." (*Id.* at p. 442.) The defendant "hit [the victim] and knocked him down." (*Ibid.*) The victim struck his head on the concrete sidewalk and died from a skull fracture. The Court of Appeal upheld the jury's second degree murder conviction based on implied malice.

Here the facts are more egregious than in *Efstathiou or Cravens*.[2] This was a deadly stealth attack which may have been motivated by racial animus. Appellant announced his intention to attack the victim. We do not know for sure exactly what appellant meant by his statement to "fuck homeboy up." But we do know this: the jury could reasonably draw the inference and find, based upon this statement, that he was acting with implied malice, i.e., a conscious disregard for life. To be sure, the victim started it by expressly announcing his hatred for Mexican Americans. Appellant was obviously offended even though the

---

[2] In *Efstathiou*, the argument grew out of termination of employment and the employee fatally assaulted his former employer.

In *Cravens*, the argument grew out of the accidental spilling of a drink on one of defendant's friends. Then an averted "bar fight" was removed to the street where defendant fatally assaulted the victim.

14

victim was not speaking to him. Appellant physically finished it and the inference may be drawn that he was motivated by his hatred for the Caucasian victim.

*Conclusion*

"For [the above] reasons, we conclude that the evidence of [appellant's] conduct and his mental state satisfied the elements of implied malice." (*Cravens*, *supra*, 53 Cal.4th at p. 511.) Appellant's contention fails because this court must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.

The judgment is affirmed.

<u>CERTIFIED FOR PUBLICATION</u>.

YEGAN, Acting P. J.

I concur:

TANGEMAN, J.

15

TANGEMAN, J., Concurring:

I concur. I agree with the majority opinion and its rationale as it applies to the outcome in this case; however, I disagree with the statement that the facts here are "more egregious" than those in *People v. Cravens* (2012) 53 Cal.4th 500. (Maj. opn. *ante*, at p. 14.)

I share my dissenting colleague's view that it is difficult to reconcile the facts of this assault with the conclusion that appellant's conduct carried "a high probability that it [would] result in death" (at p. 4, *post*, italics omitted). But the additional facts surrounding the group assault on the victim in *Cravens* are not enough, in my view, to distinguish *Cravens* from this case. Accordingly, we are bound to follow *Cravens* here. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) For that reason, I concur in the result.

<u>CERTIFIED FOR PUBLICATION.</u>


TANGEMAN, J.

1

PERREN, J., Dissenting:

My colleagues and I agree that *Cravens*[1] is controlling. In *Cravens*, our Supreme Court affirmed the defendant's conviction for second degree murder concluding, after extensively discussing the underlying facts, that substantial evidence supported the verdict of the trial jury. (*Cravens*, *supra*, 53 Cal.4th at pp. 508-512.) My colleagues rely upon a pairing of the facts in *Cravens* with the facts in the instant matter and conclude that the cases are indistinguishable. I respectfully disagree. In the factual distinction is to be found the difference between implied malice murder and manslaughter. I would reverse.[2]

The Pairing: Seth Cravens followed Emery Kauanui from a bar. Cravens punched Kauanui in the face. Kauanui fell

---

[1] *People v. Cravens* (2012) 53 Cal.4th 500 (*Cravens*).

[2] Respondent's brief erroneously states that the jury convicted appellant of both second degree murder (count 1) and voluntary manslaughter (count 2). After the verdict was returned the trial court asked the prosecutor, "As to Count 2, which was being essentially pursued on a lesser included theory, are the People moving to dismiss Count 2?" Following the People's agreement, the court further inquired: "And that's conditioned on the continuing validity of the jury's verdict of guilt as to count 1?" The prosecutor agreed.

The jury returned a verdict of guilty of second degree murder. No other verdicts were returned. Immediately thereafter the jury was discharged. The jury was correctly instructed to consider count 2 as a lesser included offense to count 1 and that if a verdict of second degree murder was their verdict the jury was not to complete or sign any other forms.

The next entry in the clerk's minutes of that same date, however, states: "Oral Motion *to dismiss Count 002 made by the People is granted.*"

1

backwards, struck his head on the pavement and died from head injuries suffered in the fall. Appellant followed Gregory Rustigian from a bar. Appellant punched Rustigian in the face. Rustigian fell backwards, struck his head on the pavement and died from head injuries suffered in the fall. Here the similarity ends.

The majority says that in *Cravens*, "the 'defendant "came flying out" without warning and "coldcocked" [the victim]' with a 'sucker punch' to the head." (Maj. opn. *ante*, at pp. 7-8, quoting *Cravens*, *supra*, 53 Cal.4th at p. 509.) This description omits the facts that distinguish *Cravens* from this case. Yes, the defendant in *Cravens* did "fly out" but only after he and his four cohorts jumped in a car, pursued victim to his home, and beat and kicked him. (*Cravens*, at pp. 503-505.) It was only when the stunned victim slowly rose from the beating that the defendant "sucker punch[ed]" him causing him to fall and strike his head. (*Id.* at p. 509.) The evidence also showed that the defendant had a history of "sucker punch[ing]" others. (*Id.* at pp. 509-510.) Here, by contrast, an angry appellant followed Rustigian from the bar and punched him once in the face. Rustigian was out on his feet and fell, striking his head on the concrete curb.

The majority, quoting from *Cravens*, concludes "'the record shows that [appellant] targeted a . . . victim who was [obviously] intoxicated . . . and therefore vulnerable.'" (Maj. opn. *ante*, at p. 9, quoting *Cravens*, *supra*, 53 Cal.4th at p. 508.) The majority does not mention, however, that Cravens was accompanied by four of his former football buddies. They confronted the victim in a bar after he accidentally spilled beer on one of them while dancing with his girlfriend. Tempers flared. The victim left the bar with his girlfriend and she drove him home. Sometime later,

2

the defendant and his companions drove to the victim's home and beat and kicked him.  The defendant continued the attack by punching the victim in the face, causing the victim to fall backward and sustain the injuries that caused his death.  (*Cravens*, at pp. 502-505.)  The evidence at trial showed "[the] defendant swung hard against a fatigued and intoxicated victim who was two inches shorter and 60 pounds lighter."  (*Id.* at p. 509.)  The height advantage was magnified by Cravens standing on a surface "extra inches" above the victim when he struck the fatal punch.  (*Ibid.*)

We are also told by the majority that "'[appellant's] conduct . . . guaranteed that [if Rustigian fell, he] would fall on a very hard surface, such as the pavement or the concrete curb.  "The consequences which would follow a fall upon a concrete walk must have been known to [appellant]."  [Citations.]'"  (Maj. opn. *ante*, at p. 10, quoting *Cravens*, *supra*, 53 Cal.4th at p. 509.)  Such an inference may reasonably flow when, as in *Cravens*, the victim has been chased, beaten, stomped and ultimately punched in the face, a very different scenario from the instant case.  Here, the combatants who were roughly the same size, were standing on a flat surface facing one another at the time the blow was struck.  What we do know of appellant is that he was angered by Rustigian's racist comments.  We also know that Rustigian had been twice warned that he had angered others in the bar and had been warned he was going to be "jumped."  He dismissed the threat out of hand.

"In the trial of cases of homicide committed by violence it is almost always important to consider the character of the weapon with which the homicide was committed, and all through the cases great emphasis is laid on the fact that a weapon likely to

produce death was used by the accused.  If the means employed be not dangerous to life, or, in other words, if the blows causing death are inflicted with the fist, and there are no aggravating circumstances, the law will not raise the implication of malice aforethought, which must exist to make the crime murder.  The distinguishing characteristic respecting the two crimes of murder and manslaughter is malice.  Without the presence of this element of malice the crime does not reach the higher degree of murder, but amounts simply to manslaughter." (*People v. Munn* (1884) 65 Cal. 211, 213; see also *Cravens*, *supra*, 53 Cal.4th at p. 508, citing *Munn*, at p. 212; *Cravens*, at pp. 516-617 (dis. opn. of Kennard, J.).)

The doctrine of implied malice contains both a physical (objective) component and a mental (subjective) component.  The physical component requires ""'the performance of 'an act, the natural consequences of which are dangerous to life.'""'" (*Cravens*, *supra*, 53 Cal.4th at p. 508; *People v. Phillips* (1966) 64 Cal.2d 574, 587, overruled on other grounds by *People v. Flood* (1998) 18 Cal.4th 470, 490, fn. 12.)  The pattern jury instruction on implied malice murder states that "[a] natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes." (CALCRIM No. 520, italics omitted.)  "Phrased in a different way, malice may be implied when [the] defendant does an act *with a high probability that it will result in death* and does it with a base antisocial motive and with a wanton disregard for human life.  [Citation.]" (*People v. Watson* (1981) 30 Cal.3d 290, 300, italics added (*Watson*); *People v. Thomas* (1953) 41 Cal.2d 470, 480 (conc. opn. of Traynor, J.).)[3]

---

[3] Our Supreme Court has recognized that these definitions of implied malice are synonymous.  (*People v. Knoller* (2007) 41

4

The mental component requires a finding the defendant "'"knows that his conduct endangers the life of another and . . . acts with conscious disregard for life."'" [Citation.]" (*Watson*, at p. 300.) A defendant's conscious disregard of the risk of serious bodily injury is insufficient to support a finding of implied malice; rather, "implied malice requires an awareness of the risk of *death*." (*People v. Knoller* (2007) 41 Cal.4th 139, 155-156, italics added.)

The facts and circumstances in *Cravens* "fall just within the outer bounds of conduct sufficiently dangerous to" establish implied malice. (*Cravens*, *supra*, 53 Cal.4th at p. 514 (conc. opn. of Liu, J.).) Here the facts and circumstances lie outside that boundary. In cases involving a single punch something in addition to the blow is required. *Cravens* involved far more than a single punch. It involved a protracted assault by a group of men and included threats, a chase, and a beating inflicted by the group ending with defendant striking the virtually helpless victim in the face with his fist. No such comparable facts or circumstances are presented in this case. Appellant's conduct, while reprehensible, falls outside the outer bounds of conduct sufficiently dangerous to support a finding that he committed an act with a high degree of probability that it would result in death.

Reviewing "the whole record in the light most favorable to the judgment below," I conclude that the evidence is insubstantial—that is, it does not disclose "evidence which is reasonable, credible, and of solid value—such that a reasonable

---

Cal.4th 139, 152.) Although our Supreme Court's recent cases have not referred to the definition set forth in *Watson* and *Thomas*, the court "[h]as never disavowed the *Thomas* formulation of implied malice, particularly with respect to the objective component. [Citation.]" (*Cravens*, *supra*, 53 Cal.4th at pp. 512-513 (conc. opn. of Liu, J.).)

trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v Johnson* (1980) 26 Cal.3d, 557, 578.)  It neither "'reasonably inspires confidence'" nor is it of ""'solid value.'"" (*People v Morris* (1988) 46 Cal.3d 1, 19, disapproved on other grounds by *In re Sassounian* (1995) 9 Cal.4th 535, 543-545.)

I would reverse.

CERTIFIED FOR PUBLICATION.


PERREN, J.

6

Jacquelyn H. Duffy, Judge

Superior Court County of San Luis Obispo

_____

Mark R. Feeser, under appointment by the Court of Appeal for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Assistant Attorney General, Zee Rodriguez, Supervising Deputy Attorney General, Theresa A. Patterson, Deputy Attorney General, for Plaintiff and Respondent.